IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
PINE BLUFF DIVISION

BRANDON LACY                                                    PETITIONER

v.                              No. 5:19-cv-95-DPM

DEXTER PAYNE, Director,
Arkansas Division of Correction                    RESPONDENT

ORDER

1.     Brandon Lacy seeks *habeas* relief from his state court
convictions and death sentence for killing and robbing Randy Walker.
Lacy confessed to killing Walker.  But he said that he did so without
the premeditation and deliberation required for capital murder.  Lacy
also argued that he did not commit aggravated robbery—as an
independent offense or a capital felony murder element.  A Benton
County jury rejected all these defenses, finding Lacy guilty of capital
murder and aggravated robbery.  At sentencing, the jury found many
mitigating circumstances and two aggravating circumstances—Lacy
committed the murder in a cruel and depraved manner and for the
purpose of avoiding arrest.  Deciding that the two aggravators
outweighed the mitigators, the jury chose the death penalty for the
capital murder.   The jury agreed on a life sentence for the robbery.
The Arkansas Supreme Court affirmed the convictions and sentences,
*Lacy v. State* (*Lacy I*), 2010 Ark. 388, 377 S.W.3d 227, and the United

States Supreme Court denied *certiorari, Lacy v. Arkansas*, 563 U.S. 964 (2011) (Mem.).

Lacy's case for post-conviction relief went up and down in the Arkansas courts.   After the Benton County Circuit Court rejected Lacy's arguments on the papers, the Arkansas Supreme Court reversed and remanded for an evidentiary hearing.  *Lacy v. State* (*Lacy II*), 2013 Ark. 34, 425 S.W.3d 746.   After hearing evidence, the circuit court found Lacy was entitled to resentencing due to his trial lawyers' penalty phase ineffectiveness.   The Supreme Court again reversed and remanded, holding the circuit court erroneously used a subjective test in evaluating the lawyers' performance.  *State v. Lacy* (*Lacy III*), 2016 Ark. 38, 480 S.W.3d 856.   On remand, the circuit court reviewed the lawyers' work under an objective standard, and denied relief.   The Supreme Court affirmed.  *Lacy v. State* (*Lacy IV*), 2018 Ark. 174, 545 S.W.3d 746.   The United States Supreme Court denied *certiorari*.  *Lacy v. Arkansas,* 139 S. Ct. 805 (2019) (Mem.).   Having exhausted his state court remedies, Lacy filed this timely federal petition for a writ of *habeas corpus*.

**2.   Factual Background.**   Lacy's defense was that significant details about the murder were and are missing—and he was too drunk to remember them.   He didn't testify at trial.   But his recorded statements and the physical evidence tell most of the story.

After an evening of drinking, Lacy and Brody Laswell showed up at Walker's trailer in Garfield, Arkansas. Lacy and Walker had met through Lacy's estranged wife; Walker sometimes gave rides to Lacy. It was shortly after midnight when Lacy and Laswell awakened Walker. The three gathered in the living room. For reasons not entirely clear, conflict erupted. Walker had a .22 caliber pistol that Lacy had sold him a few years earlier. Whether Walker pulled the pistol is murky. What is undisputed is that Walker, who suffered from multiple sclerosis, was no match for Lacy and Laswell. While Walker was sitting in his recliner, Lacy hit him over the head with a fireplace poker, as Walker repeatedly asked "Why?" Trial Record 3540. Lacy shut the living room window because he didn't want neighbors to hear Walker's cries.

Lacy got control of the .22 caliber pistol. He knew Walker had a safe, and he forced Walker into the bedroom to open it. Lacy expected to find "some money or something," but the safe was empty. Trial Record 3550. Walker then began to fight back, struggling with Lacy for the pistol. Laswell picked up a weight bar and struck Walker in the head. As Walker lay incapacitated on the bedroom floor, Lacy believed that he was "already gone," Trial Record 3602, but he wanted "to make sure," Trial Record 3625. Lacy stabbed Walker's chest several times with the fireplace poker and then used a kitchen knife to slit Walker's throat down to his spine. After Laswell went to the car,

3

Lacy used gasoline to start a fire near Walker's body.  He left the trailer with the items that he used to kill Walker.  He also took Walker's wallet, which contained twenty dollars, and the .22 caliber pistol.

Lacy and Laswell headed to the Monte Ne boat ramp on Beaver Lake, near Lacy's grandparents' home.  They washed off Walker's blood in Beaver Lake and then tried to get rid of the other evidence: They threw the fireplace set, including the poker and shovel, in the lake;  they burned their clothes, the knife, and Walker's wallet nearby. Lacy hid the stolen pistol at his cousin's apartment.

Later that day, Lacy's estranged wife, Melissa Lacy, and her boyfriend, David Weaver, found Walker's burned body on the bedroom floor of his trailer.  The medical examiner concluded that the three sets of injuries—the blunt-force head trauma, the stabbing chest wounds, and the cutting neck wound—were independently fatal and combined to cause Walker's death.

Three days after killing Walker, Lacy called 911, confessed to the murder, and asked to be arrested.  He was intoxicated, as he often was.  So Benton County Sheriff's Office investigators waited until the next morning to hear more.  Over three interviews, Lacy told how he and Laswell[1] killed Walker.  The interviews were peppered with

_____

[1] In a related case, a Benton County jury found Laswell guilty of capital murder and aggravated robbery.  He was sentenced as a

Lacy's responses that he could not recall details.  But he remembered stabbing Walker in the chest, slitting his throat, and taking the pistol.

    **3.**    **Standard Of Review.**  The governing law is settled.  Lacy, a state prisoner, may seek a writ of *habeas corpus* in federal court, if he is "in custody in violation of the Constitution or laws or treatises of the United States."  28 U.S.C. § 2254(a).  The United States Supreme Court, however, considers *habeas* relief an "extraordinary remedy," which guards against "extreme malfunctions in the state criminal justice systems." *Harrington v. Richter,* 562 U.S. 86, 102 (2011).  Quoting *Harrington,* the Supreme Court has re-emphasized this limited role of *habeas corpus* in two recent cases. *Shinn v. Martinez Ramirez,* 596 U.S. __, 142 S. Ct. 1718, 1731 (2022) (quotations omitted); *Brown v. Davenport* (*Mike Brown*), 596 U.S. __, 142 S. Ct. 1510, 1523–24 (2022) (quotations omitted).  The *habeas* statutory scheme, moreover, is "designed to strongly discourage" petitioners from offering new evidence. *Shoop v. Twyford,* 596 U.S. __, 142 S. Ct. 2037, 2044 (2022) (quotations omitted).

---

habitual offender to consecutive sentences of life imprisonment without parole for capital murder and 720 months' imprisonment for aggravated robbery.  The Arkansas Supreme Court affirmed the convictions and sentences. *Laswell v. State*, 2012 Ark. 201, 404 S.W.3d 818.  The Benton County Circuit Court dismissed Laswell's *pro se* petition for post-conviction relief as untimely, and the Arkansas Supreme Court dismissed his appeal. *Laswell v. State*, 2013 Ark. 407, 2013 WL 5596280.

Before seeking *habeas* review, Lacy must have exhausted available state remedies by fairly presenting each of his claims in state court. *Coleman v. Thompson*, 501 U.S. 722, 731 (1991); *O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999). This Court will not review questions of federal law decided in state court if the state court's decision was based on "a state law ground that is independent of the federal question and adequate to support the judgment." *Coleman*, 501 U.S. at 729–30. A "firmly established and regularly followed" state procedural rule, even if discretionary, can be an adequate ground to bar *habeas* review. *Beard v. Kindler*, 558 U.S. 53, 60 (2009) (quotations omitted). Procedural default also occurs when a petitioner fails to present a claim in state court and a state court remedy is no longer available. *O'Sullivan*, 526 U.S. at 848. A procedural default can occur at any point during state court review: at trial, on direct appeal, or during post-conviction proceedings. *Kilmartin v. Kemna*, 253 F.3d 1087, 1088 (8th Cir. 2001).

**Cause And Prejudice.** If a claim is procedurally defaulted, this Court can consider it only if Lacy establishes either cause for the default and actual prejudice, or that the default will result in a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 750. To establish cause, Lacy must "show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986).

Examples of cause include constitutionally ineffective assistance of counsel, an unavailable factual or legal basis for a claim, or interference by state officials that made complying with exhaustion requirements impracticable.   477 U.S. at 488–89.   The prejudice element generally requires Lacy to show "not merely that the errors at . . . trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions."   477 U.S. at 494 (emphasis original and quotations omitted).

**Exhausted Claims.**   On claims adjudicated on the merits in state court, this Court may grant *habeas* relief only if Lacy satisfies statutory requirements and United States Supreme Court "precedents governing the appropriate exercise of equitable discretion."   *Mike Brown*, 142 S. Ct. at 1524.   Lacy must demonstrate that the state court adjudication "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."   28 U.S.C. § 2254(d).   A decision is contrary to federal law if the state court "applies a rule that contradicts the governing law" set out by the Supreme Court, or if it considers facts that are "materially indistinguishable" from a Supreme Court case

and decides differently. *Brown v. Payton*, 544 U.S. 133, 141 (2005). Lacy also must pass the *Brecht* test for assessing the state court error's prejudicial effect. *Mike Brown*, 142 S. Ct. at 1524. He must show that the error had "substantial and injurious effect or influence" on the verdict or sentence. *Brecht v. Abrahamson*, 507 U.S. 619, 622 (1993) (quotations omitted).

**4.    Caselaw Development.** The United States Supreme Court recently provided new direction for review of procedurally defaulted ineffectiveness of trial counsel claims. In *Shinn v. Martinez Ramirez*, the Supreme Court foreclosed *habeas* review when these claims rely on evidence outside the state court record. 142 S. Ct. 1718. Because this decision worked a significant change, it is useful to trace how the law developed.

The winding road to *Shinn* began with *Coleman v. Thompson*. The Supreme Court held that, because there is no constitutional right to counsel in state collateral proceedings, post-conviction counsel's ineffectiveness cannot constitute cause to excuse procedural default. 501 U.S. at 755. The Court left open whether an exception to this constitutional rule exists when "state collateral review is the first place a prisoner can present a challenge to his conviction." *Ibid.*

In 2012, the Supreme Court revisited the issue—but not as a constitutional matter. *Martinez v. Ryan*, 566 U.S. 1 (2012). The Court held that an equitable exception to the *Coleman* rule exists when state

procedures require petitioners to raise ineffectiveness of trial counsel claims in collateral proceedings instead of on direct appeal.  Attorney error in initial collateral review proceedings may be cause to excuse procedural default of substantial ineffectiveness of trial counsel claims.  566 U.S. at 14.

The Court's reasoning was twofold.  First, the right to effective assistance of trial counsel is "a bedrock principle in our justice system."  566 U.S. at 12.  Second, absent the exception, a lawyer's negligence in the initial collateral-review proceeding results in the ineffectiveness of trial counsel claim never being reviewed.  566 U.S. at 10–12.  The Court, however, acknowledged that state courts have "sound reasons" for deferring consideration of ineffectiveness claims to the collateral review stage:  Because ineffectiveness claims "often depend on evidence outside the trial record," direct appeals—without evidentiary hearings and less time for investigation—are not necessarily the better route.  566 U.S. at 13.

The Court later expanded the equitable exception to apply when state procedural rules do not provide a "meaningful opportunity" to raise ineffective assistance of trial counsel claims on direct appeal.  *Trevino v. Thaler*, 569 U.S. 413, 428 (2013).  The Supreme Court declined to extend the *Martinez-Trevino* exception beyond procedurally defaulted ineffectiveness of trial counsel claims.  *Davila v. Davis*, 582 U.S. __, 137 S. Ct. 2058 (2017).

The *Martinez-Trevino* equitable exception applies in *habeas* review of Arkansas state court decisions. *Sasser v. Hobbs*, 735 F.3d 833, 851–53 (8th Cir. 2013).  Applying then-existing circuit precedent, the Eastern District of Arkansas has held several evidentiary hearings on "potentially meritorious" procedurally defaulted ineffectiveness of trial counsel claims.  735 F.3d at 851, 854–55.[2]

*Shinn* eliminated the possibility of evidentiary hearings under the "potentially meritorious" rubric.  The Supreme Court held 28 U.S.C. § 2254(e)(2)'s stringent evidentiary restrictions apply to procedurally defaulted ineffectiveness of trial counsel claims.  *Shinn*, 142 S. Ct. at 1728.  Pursuant to the statute, when a *habeas* petitioner "has failed to develop the factual basis of a claim" in state court, a federal court may not hold an evidentiary hearing on that claim absent satisfaction of one of two narrow exceptions.   28 U.S.C. § 2254(e)(2).  And precedent holds petitioners responsible for attorney errors that don't rise to the level of a constitutional violation.  *Murray*, 477 U.S. at 488.  A petitioner "fails" to develop a claim when "there is

---

[2] After considering the hearing evidence, this Court has denied *habeas* relief in each case. *Kemp v. Kelley*, No. 5:03-cv-00055-DPM, 2015 WL 5842552 (E.D. Ark. 2015), *aff'd* 924 F.3d 489 (8th Cir. 2019), *cert. denied sub. nom. Kemp v. Payne*, 140 S. Ct. 2770 (2020); *Anderson v. Kelley*, No. 5:12-cv-279-DPM, 2017 WL 1160583 (E.D. Ark. 2017), *aff'd* 938 F.3d 949 (8th Cir. 2019), *cert. denied sub. nom. Anderson v. Payne*, 141 S. Ct. 273 (2020); *Springs v. Kelley*, No. 5:13-cv-00005-BSM, 2021 WL 3698388 (E.D. Ark. 2021), *appeal docketed sub. nom. Springs v. Payne*, No. 22-3399 (8th Cir. 18 Nov. 2022).

a lack of diligence, or some greater fault, attributable" to the petitioner or his lawyer. *Williams v. Taylor*, 529 U.S. 420, 432 (2000). This diligence standard requires the petitioner to make a "reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court . . .." 529 U.S. at 435. Applying these rules in *Shinn*, the Supreme Court held that, because there is no constitutional right to post-conviction counsel, that lawyer's lack of diligence in developing the state court record is attributable to the petitioner. 142 S. Ct. at 1734–35. The Court rejected the argument that the *Martinez-Trevino* equitable exception applies to the statutory restriction. 142 S. Ct. at 1735–38. Under 28 U.S.C. § 2254(e)(2), federal courts therefore may not consider evidence beyond the state court record in evaluating the underlying procedurally defaulted ineffectiveness of trial counsel claim. *Ibid*. The Supreme Court further concluded that, without the availability of new evidence for merits review, a *Martinez-Trevino* hearing on procedural default "would serve no purpose." 142 S. Ct. at 1738–39. Under those circumstances, federal courts also are prohibited from "hold[ing] an evidentiary hearing—or otherwise consider[ing] new evidence—to assess cause and prejudice under *Martinez*." 142 S. Ct. at 1739.

When 28 U.S.C. § 2254(e)(2) bars consideration of new evidence, Lacy's only path forward is the statute's narrow exception. Lacy first must show one of two things: that the claim relies on a new rule of

constitutional law, which has been made retroactive to collateral review cases by the Supreme Court, and was not previously unavailable; or that the claim relies on new facts that couldn't have been previously discovered with due diligence. 28 U.S.C. § 2254(e)(2)(A). Whichever exception may apply, Lacy must then demonstrate that the facts supporting the claim are "sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense." 28 U.S.C. § 2254(e)(2)(B).

     **5.**    **Hearing Requests.** In his traverse, Lacy requests a hearing on three points: (1) "potentially meritorious" procedurally defaulted ineffectiveness of trial counsel claims under a *Martinez-Trevino* analysis; (2) the procedural default of other claims; and (3) the merits of any claims cognizable in post-conviction proceedings that he wasn't at fault for failing to develop. *Doc. 16 at 163.*

     Lacy's general request for a hearing on procedural default is not sufficiently developed. And either § 2254(e)(2) bars consideration of new evidence, or the existing record provides an adequate factual basis on which to rule fairly.

     The parties completed briefing before the Supreme Court's decision in *Shinn*. Lacy's arguments for a *Martinez-Trevino* hearing therefore are based on pre-existing precedent. But supplemental briefing would not be helpful. Lacy is no longer permitted a *Martinez-*

*Trevino* hearing on potentially meritorious procedurally defaulted ineffectiveness of trial counsel claims. With these ineffectiveness claims and any other claim cognizable in post-conviction proceedings, Lacy must clear 28 U.S.C. § 2254(e)(2)'s high hurdle. *Shinn,* 142 S. Ct. 1718.

Lacy contends that he isn't responsible for the failure to develop post-conviction claims. He sought post-conviction relief pursuant to Rule 37.5 of the Arkansas Rules Of Criminal Procedure. The case spent almost seven years in state court. Patrick Benca was Lacy's post-conviction lawyer, except during the case's third and final trip to the Arkansas Supreme Court. Lacy says the circuit court prevented him from amending his Rule 37 petition, and Benca abandoned him. Under 28 U.S.C. § 2254(e)(2), Lacy is not "at fault" if his diligent efforts were "thwarted" by the circuit court or Benca's abandonment. *Williams,* 529 U.S. at 432. Lacy, however, hasn't shown the diligence required to avoid § 2254(e)(2) evidentiary restrictions.

After the Arkansas Supreme Court reversed the denial of Rule 37 relief and remanded the case for an evidentiary hearing, Lacy raised the possibility of an amended petition. But he had no answer when the circuit court asked him to "pinpoint . . . with specificity" any new grounds for relief. Rule 37 Record (CR-15-171) 611. He referred only to potential new allegations based on witness interviews and issues arising at the evidentiary hearing. He said there had not been enough

time to investigate.  The circuit court denied Lacy's request for the time being, but invited Lacy to "submit authorities."  Rule 37 Record (CR-15-171) 614.

Lacy later argued in a new trial motion and on the record that the prosecutor had frequently abused his subpoena power in other cases.[3]  Lacy's lawyer, Benca, said that he only recently learned this information, though Lacy similarly challenged at trial and on direct appeal the misuse of the prosecutor's subpoena in his case.  *Lacy I*, 2010 Ark. 388, *28–31, 377 S.W.3d at 243–44.  The circuit court denied the new trial motion, holding Lacy had not raised a violation of his constitutional rights.  Lacy's proposed amended petition contained a related ineffectiveness allegation, plus one more:  His trial lawyers' work was constitutionally deficient for not challenging the prosecutor's misuse of the subpoena power and penalty phase rebuttal closing argument.

At a motions hearing, Lacy's lawyer argued that, after learning of the prosecutor's subpoena being abused in other cases, he interviewed Lacy's family members, who shared similar stories.  He said that he was in the process of preparing a more in-depth proposed

---

[3] Under state law, prosecuting attorneys and their deputies are permitted to "issue subpoenas in all criminal matters they are investigating and may administer oaths for the purpose of taking the testimony of witnesses subpoenaed before them."  Ark. Code Ann. § 16-43-212.

amended petition with these additional facts.  He asked the circuit court to reserve a ruling on the motion to amend, so that he would have more time to complete an enlarged amended petition.  The circuit court acknowledged Lacy's request and didn't rule on the motion.

More than a year later, on the day before the evidentiary hearing, Lacy renewed his motion to amend.  The proposed petition was almost identical to the earlier filing.  Lacy argued that the amended petition was warranted because of the delay in his receiving the trial record.  He also challenged the constitutionality of Arkansas's time limit on filing Rule 37 petitions.  The circuit court denied Lacy's request to amend his petition.

Based on the Rule 37 record, the circuit court isn't responsible for Lacy's failure to develop additional Rule 37 claims.  The direct appeal record gave Lacy notice of the proposed grounds for relief.  The circuit court didn't interfere with his ability to allege facts supporting those grounds in a timely fashion.

Lacy's argument that his Rule 37 lawyer abandoned him fares no better.  He points to a February 2017 ethics complaint that he says alleged Benca's lack of communication.  And he refers to Benca's request to withdraw as appellate counsel based on a "fractured" attorney-client relationship.  *Doc. 16 at 27.*  Lacy also says Benca abandoned him when he did not file an enlarged Rule 37 petition.

Even if proven, these allegations would not demonstrate that Benca stopped acting as Lacy's representative. *Maples v. Thomas*, 565 U.S. 266, 281–82 (2012). The facts show a strained relationship, not that Benca "literally abandoned" him. *Sasser*, 735 F.3d at 850 n.11.

Any failure to develop procedurally defaulted post-conviction claims is attributable to Lacy. *Shinn*, 142 S. Ct. at 1734–35. Under § 2254(e)(2), Lacy did not make a "reasonable attempt" to pursue them. *Williams*, 529 U.S. at 435. Neither the circuit court's rulings nor Benca's alleged abandonment provides an excuse. And none of these claims satisfy the statutory exception. 28 U.S.C. § 2254(e)(2)(A) & (B). Section 2254(e)(2) therefore bars new evidence, so Lacy's embedded request for an evidentiary hearing is denied.

Early on in this proceeding, Lacy sought discovery of the prosecutor's work-product and victim-outreach files, and to depose the prosecutor. *Doc. 18*. Before the United States Supreme Court's decision in *Shinn*, this Court denied the motion without prejudice. The Court asked Lacy to renew his discovery request, if necessary, after the Court winnowed the claims to those with the most merit and any that justify an evidentiary hearing. *Doc. 23*. Under *Shinn*, a winnowing order is no longer warranted. Based on this Court's analysis of claims and procedural defenses, and the evidentiary restrictions imposed by *Shinn* and 28 U.S.C. § 2254(e)(2), Lacy could

not establish good cause to support a renewed discovery request. Rule 6(a) of the Rules Governing § 2254 Cases.

**6.     Excuses For Procedural Default.**  Appendix A lists Lacy's thirty-four claims for relief.  He mostly raises claims challenging his state court lawyers' performance.  He argues that they should have worked harder and made different decisions.  He also contends that he didn't receive a fair trial due to a biased judge and jury, and the prosecutor's misconduct.  He says there were *voir dire* mistakes and incomplete jury instructions.  He challenges the medical examiner's testimony, and he argues there wasn't sufficient evidence of guilt or the avoid-arrest aggravator.   The record, however, contains overwhelming evidence that Lacy committed capital murder and of the aggravators supporting the death sentence.  Lacy did not contest that he killed Walker, stabbing him in the chest and slitting his throat. The jury heard Lacy's recorded statement that, after he and Laswell inflicted the fatal wounds, he started a fire to burn Walker's body.  He admitted taking Walker's pistol.

Most claims are procedurally defaulted.  Lacy contends cause exists to excuse the default of all claims cognizable in Rule 37 proceedings.  He relies on the same arguments made in support of an evidentiary hearing.  He says the circuit court didn't permit him to amend his petition, and his Rule 37 lawyer's actions amounted to abandonment.  These arguments are likewise unpersuasive under a

cause analysis.  Neither the circuit court's rulings nor Benca's actions constitute "some objective factor external to the defense" preventing compliance with state procedural rules.  *Murray*, 477 U.S. at 488.

Lacy makes other arguments to show cause.  He contends that his default of ineffective assistance of trial counsel claims is excused under a *Martinez-Trevino* analysis.  He also asks this Court to extend *Martinez-Trevino* to cover his judicial bias claim.  He argues the prosecutor's suppression of evidence amounts to cause excusing procedural default of the related claim.  He says two claims challenging his death sentence are based on data not available during state court proceedings, and a third challenge would have been futile under state law.  The Court will address these procedural default excuses in connection with the underlying claims.

To demonstrate prejudice to lift the procedural bar, Lacy points to his arguments supporting the underlying merits of each claim.  This Court's review, however, has not uncovered any errors that "worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions."  *Murray*, 477 U.S. at 494 (emphasis original).   To the extent Lacy alleges prejudice as an element of the underlying claim, the Court will address the specific argument under the appropriate legal standard when reviewing those claims.

**7.     Ineffectiveness Of Trial Counsel Claims.**   Lacy was represented at trial by four lawyers:  Steve Harper from the Arkansas Public Defender Commission's Capital Conflicts Unit;  and Jay Saxton, Tony Pirani, and Brynna Barnica from the Benton County Public Defender's Office.  Saxton was in charge of Lacy's defense;  Harper handled the penalty phase.   Lacy vigorously challenges his trial lawyers' work at every turn.  These are Claims 1, 2, 5, 6, 7, 8, 10, 11, 14, 15, 17, 19, 20, 22, and 24.   Most are procedurally defaulted.   The *Martinez-Trevino* equitable exception applies to claims defaulted in the initial collateral review proceeding.  *Martinez,* 566 U.S. at 14.

To demonstrate constitutional ineffectiveness under the familiar *Strickland v. Washington* standard, Lacy must show deficient performance and resulting prejudice.   466 U.S. 688 (1984).   "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on has having produced a just result."   466 U.S. at 686.   Lacy must overcome the "strong presumption" that his lawyers acted "within the wide range of professional assistance."   466 U.S. at 689.   To satisfy the prejudice element, he must demonstrate "a reasonable probability that, but for counsel's professional errors, the result of the proceeding would have been different."   466 U.S. at 694.

**Pretrial.**  Lacy argues his trial lawyers' pretrial performance fell short of constitutionally adequate representation.  Based on media reports of his confession and the jury panel's exposure, Lacy says his lawyers should have worked harder to move his trial out of Benton County.  He says they should have discovered that one of Walker's children opposed seeking the death penalty, and then used that information to spur plea negotiations.  And he says they should have discovered the prosecutor's contribution—during the year before his capital murder trial—to the trial judge's election campaign, and then sought the trial judge's recusal based on an appearance of bias.

These three ineffectiveness claims are procedurally defaulted. Section 2254(e)(2) bars consideration of the new evidence relied on by Lacy.  *Shinn*, 142 S. Ct. 1718.  Based on the existing record, procedural default is not excused.  Lacy hasn't shown a substantial ineffectiveness claim under the *Martinez-Trevino* equitable exception. He hasn't demonstrated these ineffectiveness claims have "some merit."  *Martinez*, 566 U.S. at 14.  Whether the trial lawyers' work was constitutionally effective would not be debated among reasonable jurists.  *Dorsey v. Vandergriff*, 30 F.4th 752, 757–58 (8th Cir. 2022). Claims 7, 8, and 10 are denied.

**Voir Dire.**  Lacy also challenges his trial lawyers' *voir dire* work. He says that they should have posed more questions to potential

jurors, objected to the prosecutor's remarks, and made different jury-selection decisions.  Claim 24 is procedurally defaulted.

Lacy says his trial lawyers were remiss in not pressing harder for individual, sequestered *voir dire*.  He says they should have done more to uncover if potential jurors understood the importance of mitigation evidence.  There's no indication, however, that a different *voir dire* procedure or more probing questions would have changed the jury's composition.   Lacy argues constitutional standards required his lawyers to object to the prosecutor's statements—jurors should expect to hear from a psychologist or psychiatrist.  He says that, because his lawyers didn't call a mental-health expert during the guilt phase, the statements created a false expectation and impermissibly shifted the burden of proof.  His trial lawyers' decision not to object, however, was "within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.  Lacy also contends his trial lawyers used peremptory strikes on favorable jurors.  But their decisions don't fall outside the "wide range" either.  *Ibid.*  Lacy hasn't demonstrated his lawyers' jury-selection strategy was unreasonable under *Strickland*.

Lacy contends his trial lawyers committed constitutional error when they didn't seek Juror Afton Gildehaus's removal for cause, or use a peremptory strike, based on her death penalty views.  He says better questions would have further revealed her bias.  Gildehaus stated during *voir dire* that she was "for" the death penalty, "if there's

evidence to support that [the murder] was premeditated, out of anger or violence or another crime being committed." Trial Record 1151. According to Lacy, Gildehaus has signed an affidavit stating that she voted for the death penalty because Walker's murder was premeditated. The affidavit is beyond this Court's review. 28 U.S.C. § 2254(e)(2); *Shinn*, 142 S. Ct. 1718. Gildehaus, moreover, stated during *voir dire* that she could "keep an open mind" and "take into account" intoxication at the time of the crime as a potentially mitigating circumstance. Trial Record 1153–55, 1172–73. On this record, Lacy hasn't shown Gildehaus's "views would prevent or substantially impair the performance of [her] duties" based on the jury instructions and oath. *Wainwright v. Witt*, 469 U.S. 412, 424 (1985) (quotations omitted). Lacy hasn't demonstrated his lawyers failed him in not seeking her removal. *Williams v. Norris,* 612 F.3d 941, 954–55 (8th Cir. 2010). *Voir dire* on this point wasn't constitutionally deficient.

Lacy also argues his trial lawyers' work was inadequate when they didn't seek to remove for cause Kimberly Hutcheson or Mary Chestnut. Lacy's lawyers used a peremptory strike on Hutcheson. Juror Chestnut heard another potential juror, who was familiar with the Lacy family, state that Lacy wasn't a good parent. But Chestnut said nothing would prevent her from being fair and impartial. Lacy hasn't shown his trial lawyers' jury strategy amounted to deficient

performance or resulted in *Strickland* prejudice. He hasn't demonstrated that Chestnut was biased against him or that seating her deprived him of a fair trial. *Ibid.*

Lacy next argues his lawyers should have tried to rehabilitate Audra Steele before she was removed for cause. Steele had qualms about imposing the death penalty, and she became visibly upset when talking about Lacy's children. The trial lawyers' work here wasn't constitutionally deficient. They made a reasonable strategic decision that "there was no point in attempting to rehabilitate" Steele. *Foster v. Delo*, 39 F.3d 873, 878 (8th Cir. 1994).

None of Lacy's ineffectiveness claims are substantial under a *Martinez-Trevino* analysis. Reasonable jurists would not debate his trial lawyers' constitutional effectiveness during *voir dire*. *Dorsey*, 30 F.4th at 756–57. Procedural default is not excused. Claim 24 is denied.

**Evidence Suppression.** The jury heard audio recordings of Lacy's three interviews in which he confessed to killing Walker. Lacy argues his trial lawyers committed constitutional error when they didn't try to suppress these statements. He says the statements weren't voluntary because he was sleep deprived and suffering from alcohol withdrawal. He says he was vulnerable to suggestive questioning and confused about his *Miranda* rights. During his first interview, Lacy refused to identify Laswell—until investigators

23

searched his cell-phone data and discovered Laswell's name.  Lacy contends his trial lawyers were remiss for not seeking to suppress the fruits of the cell phone search.  Claims 5 and 6 are procedurally defaulted.

After responding to Lacy's 911 call, Rogers police officers arrested Lacy for public intoxication and transported him to the police department.  They contacted Greg Hines, the Benton County Sheriffs' Department lead investigator in the unsolved Walker case.  Shortly after 7 p.m., Lacy was transported to the Benton County jail.  Because Lacy was still intoxicated, Investigator Hines did not interview him until the next morning at 9 a.m.

Before the interview, Lacy was advised of his rights;  he completed and signed a *Miranda* form.  Lacy admitted hitting Walker in the head with the fireplace poker and forcing him to open his safe. He stated that he started the fire in Walker's bedroom.  Lacy refused to identify Laswell.  He said his "friend" hit Walker with a weight bar. Trial Record 3523 (Audio Recording) & 3544–45.   During the interview, Investigator Hines learned Lacy's cell phone was seized incident to his arrest.  There was a short break in the interview while investigators searched Lacy's recent calls.   They found Laswell's name.  When the interview resumed, Lacy admitted Laswell was the "friend."  He said that, after killing Walker, they washed off his blood in Beaver Lake's Monte Ne area.

Investigator Hines interviewed Lacy again at 8:46 p.m.  By this time, officers had arrested and interviewed Laswell.  Hines's questions of Lacy were prompted by information learned from Laswell.  Investigators had taken Laswell to the Monte Ne area.  Laswell had indicated where he and Lacy threw the fireplace set into the water;  he showed the investigators where they burned the knife, Walker's wallet, and their clothes.  Investigators were still looking for the .22 caliber pistol.  Lacy stated that he hid the pistol in his cousin's closet.  He identified his cousin as Zach Fender.  When prompted by Investigator Hines, Lacy admitted stabbing Walker with the fireplace poker and using a kitchen knife to cut his throat.  He asked about being moved from the holding cell because he hadn't been given a blanket and didn't have access to a bathroom.

Lacy gave a third statement the next day to Sergeant Dennis Schumacher.  He said that he remembered his rights read to him by Investigator Hines.  Lacy admitted struggling with Walker for control of the .22 caliber pistol.  He said that, after Laswell struck Walker with the weight bar, he stabbed Walker and cut his throat "to make sure he was dead."  Trial Record 3616 (Audio Recording), 3623, 3625.  Like Laswell the day before, Lacy identified the Beaver Lake location where they threw the fireplace set into the water;  and he pointed out where they burned the other evidence.

The record is clear that Lacy understood his rights and wasn't coerced.  His waiver was knowing and intelligent;  this record shows he understood his rights and the consequences of abandoning them. *Moran v. Burbine,* 475 U.S. 412, 421 (1986).  Both the waiver and statements were voluntary.  During the first interview, Lacy stated that he was "in . . . a major blur," Trial Record 3523 (Audio Recording) & 3535, and "shaky from drinking," Trial Record 3523 (Audio Recording) & 3531.  He said that he was an alcoholic and had been drinking for several days.  The interrogation circumstances, however, don't show Lacy's "will [was] overborne" or "his capacity for self-determination critically impaired." *Culombe v. Connecticut,* 367 U.S. 568, 602 (1961).  Lacy hasn't pointed to any "coercive police activity." *Colorado v. Connelly,* 479 U.S. 157, 167 (1986).  There's not a reasonable probability that the trial court would have granted a motion to suppress Lacy's statements. *Strickland,* 466 U.S. at 694.  His trial lawyers' work wasn't constitutionally deficient, and Lacy hasn't shown actual prejudice.  466 U.S. at 687.

The trial lawyers' decision not to seek suppression based on the cell phone search wasn't constitutional error either.  Lacy relies on the United States Supreme Court's holding in *Riley v. California* that, absent exceptions, police may not conduct a warrantless search incident to arrest of digital information on a cell phone.  573 U.S. 373 (2014).  He contends that, even though the Supreme Court decided

26

*Riley* five years after his 2009 jury trial, the decision was an application of existing law.  He says the cell phone search issue was already in the air by 2009.   But, at the time of Lacy's trial, cell phone searches incident to arrest were permitted in Arkansas.  *Johnson v. State,* 2015 Ark. 387, *5 n.2, 472 S.W.3d 486, 489 n.2.   The lack of controlling precedent at the time of Lacy's trial is fatal to his argument.  *Basham v. United States,* 811 F.3d 1026, 1029 (8th Cir. 2016).  Lacy's trial lawyers can't be expected to "anticipate a rule of law that has yet to be articulated by the *governing courts*."   811 F.3d at 1029 (quotations omitted and emphasis original).   Their decision not to seek suppression of evidence stemming from the cell phone search was professionally reasonable.

Applying *Martinez-Trevino*, procedural default of these claims isn't excused.  On this record, neither has "some merit."  *Martinez*, 566 U.S. at 14.  Claims 5 and 6 are denied.

**Forensic Evidence.**   Dr. Frank Peretti, the State Crime Lab forensic pathologist, performed Walker's autopsy.  He testified during the guilt phase about Walker's cause of death.   Lacy argues his trial lawyers should have retained an independent pathologist to review the autopsy report and challenge Dr. Peretti's analysis.  He says they should have objected to  Dr. Peretti's testimony about the timing of Walker's death.  Lacy also contends his lawyers' cross-examination of

27

the State Crime Lab DNA examiner was constitutionally deficient. This is procedurally defaulted Claim 2.

Because of the intervening Labor Day holiday, Dr. Peretti performed an autopsy on Walker's body four days after it was discovered.  He testified Walker had several forehead lacerations and "massive fracturing of the entire skull."  Trial Record 2570.  While Dr. Peretti detected hemorrhaging, he was unable to discover more about the brain injury because Walker's body was charred and decomposing.  He testified Walker also sustained four upper-chest stab wounds that pierced his lungs and caused internal bleeding.  He said that, while the autopsy showed Walker was alive when he was stabbed, the wound pattern indicated that he wasn't struggling.  He said Walker also was alive when he suffered a cutting wound across his neck.  Walker's neck was cut down to his spine and involved the right carotid artery and jugular vein.  Dr. Peretti found no defensive wounds.

Dr. Peretti testified that each set of blows—blunt-force head trauma, chest stab wounds, and cutting neck wound—combined to cause Walker's death.  He also said each could have independently caused death.  He testified the odds were "really low" that Walker remained conscious after the blows to his skull.  Trial Record 2585–86.

A contested point during the guilt phase was if Walker was still alive when Lacy set the fire.  Dr. Peretti's "preliminary finding" was

28

that Walker was "dead at the time of the fire."   Trial Record 20, 27. His initial finding, however, was without the benefit of toxicology test results.    The test results included the carbon monoxide level in Walker's blood (carboxyhemoglobin) at the time of his death.   Dr. Peretti included the test results in his autopsy report and considered them in analyzing whether Walker inhaled smoke from the fire.

Dr. Peretti determined that Walker didn't have observable soot in his air passages, but that his carboxyhemoglobin level indicated that he was "alive during the fire."   Trial Record 3673.   Dr. Peretti testified Walker's clear air passages, combined with a fifteen percent carboxyhemoglobin level, led him to the conclusion that Walker was a smoker.   He explained that a heavy smoker can have an elevated carboxyhemoglobin level of ten percent.   He said that, as he was dying, Walker may have "just taken in a . . . deep breath . . . of a little smoke and CO" to account for the remaining five percent.   Trial Record 2548.   He testified Walker "was alive probably and/or in the process of dying" when the fire started.  Trial Record 2549.  Dr. Peretti assumed regular smoking cannot account for a carboxyhemoglobin level as high as fifteen percent.    On cross-examination, Harper showed Dr. Peretti a professional journal article referring to smokers having up to a fifteen percent carboxyhemoglobin level.   Dr. Peretti acknowledged the article but did not change his opinion.

Mary Simonson, the State Crime Lab forensic DNA examiner, also testified. She said DNA extracted from Walker's blood sample was consistent with blood samples from Walker's trailer and tennis shoe, Lacy's tennis shoe, Laswell's tennis shoe, the weight bar, and a rag. Simonson also tested the DNA of skin cells left on the rag to determine if someone other than Walker transferred skin cells while wiping their hands. She testified that, while Walker's DNA was the main component of the transferred skin cells, there was DNA from more than one person.

The forensic testimony was part of guilt phase closing arguments. The prosecutor argued Lacy was thinking clearly and not incapacitated by alcohol when he killed Walker. He pointed to Lacy's actions during and after the murder, including wiping Walker's blood with the rag. Trial Record 2884. He told the jury that Walker was "alive when he began to burn." Trial Record 2891. Lacy's lawyer, Pirani, challenged Dr. Peretti's analysis involving Walker's carboxyhemoglobin level. He argued that, based on Dr. Peretti's testimony, it was possible, but not likely, that Walker was alive when Lacy set the fire. He referred to Walker's smoking. He reminded the jury that Dr. Peretti became "exasperated" and "distressed" when faced with a journal article refuting his assumption about carboxyhemoglobin levels and smokers. Trial Record 2927.

Lacy argues an independent pathologist would have emphasized that Laswell inflicted the primary blows causing Walker's death, while he stabbed Walker and cut his throat only after death was inevitable. He says an independent pathologist would have testified that Dr. Peretti's conclusions were compromised due to Walker's decomposed body. Lacy contends that, after hearing this kind of testimony, there's a reasonable probability the jury would have found him guilty of first-degree murder. Lacy also argues that his trial lawyers should have worked harder to challenge Dr. Peretti's testimony that Walker was still alive when he set the fire. He says they should have presented evidence that Walker was a heavy cigarette smoker and also smoked marijuana. He says an independent pathologist would have attacked Dr. Peretti's assumption that a heavy smoker's carboxyhemoglobin level can reach only ten percent. Lacy contends that, absent these errors, he would have avoided the death penalty because the jury wouldn't have found the cruelty aggravator.

The trial lawyers' decision not to retain an independent expert or present more evidence was professionally reasonable. Cross–examination was constitutionally adequate. Pirani challenged Dr. Peretti's carboxyhemoglobin analysis during closing argument. Lacy hasn't shown his trial lawyers were "not functioning as the counsel guaranteed . . . by the Sixth Amendment." *Strickland,* 466 U.S. at 687. There isn't a reasonable probability, moreover, that the additional

steps urged by Lacy would have made a difference at guilt or sentencing.   466 U.S. at 694.   Dr. Peretti acknowledged that his conclusions were incomplete because Walker's body was burned.  He determined Walker was a smoker.  He said that each set of blows could have independently caused death, and that Walker was probably unconscious after suffering the head trauma.

Lacy also argues his trial lawyers should have raised a Confrontation Clause objection to Dr. Peretti's testimony of Walker's carboxyhemoglobin level.   The Confrontation Clause prohibits admission of "testimonial statements" from a witness not at trial, unless the witness is unavailable and the defendant had an earlier opportunity for cross-examination.  *Crawford v. Washington*, 541 U.S. 36, 59 (2004).  Lacy contends the lab results were admissible only with the forensic toxicologist's testimony.

Under controlling precedent at the time of Lacy's trial, the Confrontation Clause was not violated when an expert testifies about independent conclusions from another scientist's test results.  *United States v. Richardson,* 537 F.3d 951, 960 (8th Cir. 2008).  The toxicology test results aren't testimonial.   *Ibid.*  Dr. Peretti was permitted to "analyze data" and make "independent conclusions" based on Walker's carboxyhemoglobin level at the time of his death.   *Ibid.* Lacy's trial lawyers weren't required to make a meritless objection.

Lacy next argues that a more thorough cross-examination of Simonson, the forensic DNA examiner from the State Crime Lab, would have challenged the prosecution's theory that Lacy was the primary assailant. He contends his trial lawyers' work was constitutionally deficient when they didn't cross-examine her about the skin cells found on the rag. Lacy says his lawyers should have elicited from Simonson that, if DNA samples from him and Laswell had been made available, test results may have excluded him as a handler of the rag. Lacy, however, hasn't shown a reasonable probability that a more rigorous cross-examination of Simonson would have made a difference in sentencing.

Under a *Martinez-Trevino* analysis, none of Lacy's ineffectiveness arguments related to forensic evidence are substantial. Reasonable jurists would not debate whether the *Strickland* standard was satisfied. *Dorsey*, 30 F.4th at 756–57. Procedural default is not excused. Claim 2 is denied.

**Criminal Responsibility.** Lacy contends his trial lawyers missed the argument that, due to a mental disease or defect, he wasn't criminally responsible for killing Walker, or, alternatively, he lacked the capacity to form the *mens rea* for capital murder. He says that, because his lawyers knew about his head injuries and substance abuse, more investigation was required. He contends that, if his lawyers had presented this evidence, there's a reasonable probability

that he wouldn't have been found guilty of capital murder. This is Claim 11.

Lacy similarly argued in state court that his trial lawyers failed to present the affirmative defense of mental disease or defect. The Arkansas Supreme Court held the trial lawyers' work wasn't constitutionally deficient for three reasons: (1) "Harper conducted a thorough investigation into Lacy's cognitive abilities and at least three psychologists failed to diagnose him with a mental disease or defect"; (2) only one doctor found Lacy had a mental disease or defect, and the circuit court gave more weight to the criticism of his methodology; and (3) no expert testified that Lacy was incompetent or couldn't remember the murder. *Lacy II,* 2016 Ark. 38, *7–8, 480 S.W.3d at 860-61. The Supreme Court didn't reach the issue of *Strickland* prejudice. Lacy says his state court claim has been fundamentally altered by his new argument related to the effects of fetal alcohol exposure. But he hasn't developed any argument challenging his lawyer's guilt phase effectiveness based on undiscovered maternal drinking. This claim is exhausted, so *habeas* review is under 28 U.S.C. § 2254(d) deference. This Court may consider only the facts before the state court. *Cullen v. Pinholster,* 563 U.S. 170, 182 (2011).

The Arkansas Supreme Court's decision was not contrary to, or an unreasonable application of, clearly established federal law; nor was it an unreasonable determination of the facts. 28 U.S.C. § 2254(d).

34

The Supreme Court's *Strickland* analysis was proper.  Review of the trial lawyers' work is "highly deferential" and "every effort [must] be made to eliminate the distorting effects of hindsight."  466 U.S. at 689.  "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable;  and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation."  466 U.S. at 691.

The Supreme Court wasn't unreasonable in holding Lacy failed to satisfy the *Strickland* performance element.  Harper testified at the Rule 37 hearing.  He admitted there were signs pointing to possible brain damage.  Lacy reported head injuries.  He twice attempted suicide.  He started drinking alcohol when he was eleven years old and huffing chemical fumes when he was fifteen years old.  Lacy had shown symptoms of alcohol-induced amnesia, affecting his memory of events (including the Walker murder) occurring while he was under the influence.  He had participated in a substance abuse program.  He suffered from depression and alcohol dependence.

Two years before killing Walker, Lacy twice attempted suicide and was admitted to Vista Heath, a psychiatric hospital.  Some of Harper's information came from the Vista Health evaluation report prepared by Dr. Donnie Holden, a psychiatrist.   Dr. Holden diagnosed Lacy with depressive disorder, not otherwise specified;

alcohol dependence;  and alcohol amnestic disorder.  Other information came from Lacy and his family.  But there were stumbling blocks to the trial lawyers' investigation.  Harper ruled out Lacy's mother, step-father, and grandparents as "reliable sources" for "an adaptive skills assessment."  Rule 37 Record (CR 15-171) 86.

The trial lawyers nonetheless acted on their suspicions and consulted with mental health experts about Lacy's brain functioning. Their first step was requesting a competency evaluation.  The court-appointed expert, Dr. Robin Ross, a forensic psychiatrist, made three findings:  (1) Lacy had the capacity to assist in his own defense; (2) Lacy did not have a mental disease or defect;  and (3) Lacy didn't lack the capacity to appreciate the criminality of his conduct, or conform his conduct to the requirements of the law.  Dr. Ross diagnosed Lacy with alcohol dependence; depressive disorder, not otherwise specified;  a history of cannabis and methamphetamine dependence, and hallucinogen abuse.

The trial lawyers next consulted with Dr. Curtis Grundy, a forensic psychologist, about Lacy's "blacking out, his mental status, mental state, [and] intelligence."  Rule 37 Record (CR15-171) 956.  Dr. Grundy conducted a clinical interview and mental-status assessment, and he gave Lacy a battery of psychological tests.   He made behavioral observations and interviewed Lacy's family members.  He reviewed Lacy's school and medical records, and Dr. Ross's report.

Dr. Grundy orally reported the psychological test results and his findings to Lacy's lawyers. There was "ongoing communication" between them. Rule 37 Record (CR15-171) 1271.

Looking for a more conclusive opinion on possible neuropsychological deficits, the trial lawyers contacted a third expert—Dr. Robert Forrest, a neuropsychologist. They provided him with extensive records and asked for an oral opinion. Harper prepared a file memo summarizing Dr. Forrest's opinion:

> Dr. Forrest called today regarding Brandon. He has looked over the records we gave him and has talked to Dr. Grundy. In his opinion, neuropsych testing is not necessary unless our threshold for finding something wrong is very low or [we] want to be absolutely sure nothing is wrong. Brandon manages to function well socially and functions well when he is sober. He did well on the memory testing that Grundy gave. He doubts very seriously that neuropsych testing would indicate anything significant. The testing would not be "foolish" but not worth the time and money. Cost/benefit issue would lead to small yield. No deficit jumped out in any area. Brandon is not impaired in ability to do a trial. As far as Alcohol Amnesia is concerned, it is not uncommon to bring back memories with cues but some of the memories won't come back at all.

Rule 37 Record (CR15-171) 1421.

After receiving Dr. Forrest's oral report, the defense team met with Dr. Grundy. They discussed Dr. Forrest's conclusion that there was "no need" for more testing for "organic brain damage." Rule 37

37

Record (CR15-171) 89.   They reviewed Lacy's test scores and recognized he was "low functioning."   *Ibid.*   They noted Lacy had "alcohol amnesia," and denied the version of events that he told investigators. *Ibid.*   The defense team considered the best way to tell the jury about Lacy's substance abuse.  They talked about Lacy's other qualities:  addictive personality, stunted emotional development, and volatility.    The defense team decided  Dr. Grundy's testimony wouldn't be helpful in the guilt phase.  After considering Dr. Forrest's opinion,    the    trial    lawyers    didn't    request    funding    for neuropsychological testing or pursue an affirmative defense based on the lack of criminal responsibility.

Two months later, Dr. Grundy evaluated Lacy a second time and determined he was competent to stand trial.[4]  In his written report, Dr. Grundy    diagnosed   Lacy   with   major   depressive   disorder, recurrent, moderate; alcohol dependence, in remission; and abuse of multiple substances.  He concluded Lacy's "expressed thoughts" were "coherent, logical, and goal-directed."   Trial  Record  3464; Rule 37

---

[4] Harper was concerned that, without specific memories of the night that he and Laswell killed Walker, Lacy wasn't competent to stand trial.   In a written motion, Harper asked the trial court to authorize "treatment to regain suppressed memory" at the State Hospital.  Trial Record 231.  He also asked  Dr. Grundy to prepare a written evaluation report on Lacy's competency to stand trial.  After hearing Dr. Grundy's testimony and the parties' arguments, the trial court denied Lacy's motion.

Record (CR15-171) 1552.   He found Lacy was able to engage in "rational decision-making." Rule 37 Record (CR15-171) 1556.

Three experts addressed Lacy's brain functioning at the Rule 37 hearing.  Dr. Jeffrey Gould, a forensic psychiatrist, testified that, based on an interview with Lacy and some collateral information, he did not see signs of neurological deficits.  But he said that, in California where he practices, all capital murder defendants receive brain imaging and neuropsychological testing.  He would have recommended neuropsychological testing.  Dr. Gould diagnosed Lacy with depressive disorder, not otherwise specified; alcohol dependence; and cannabis dependence.

Dr. Barry Crown, a neuropsychologist, diagnosed Lacy with cognitive disorder, not otherwise specified, finding that Lacy had "significant neuropsychological impairment impacting multiple functional areas." Rule 37 Record (CR15-171) 1117.  He determined Lacy had functional impairment in the areas of delayed memory, reasoning, judgment, and language-based critical thinking.   Dr. Crown believed a significant portion of the damage occurred during Lacy's childhood or early adolescence.   He referred to possible fetal-alcohol exposure.

Dr. Jack Randall Price, a neuropsychologist, criticized Dr. Crown's methodology and challenged his diagnosis.  He testified there were no clinically significant findings that Lacy's brain function

was compromised.  He said Dr. Crown's diagnosis meant only that there is some documentation of a brain injury or illness with testing showing mild neurocognitive problems.  Dr. Price found no evidence of brain trauma in Lacy's medical records.  He testified that, while Lacy's long history of alcohol abuse likely compromised his brain functioning, Dr. Crown's testing didn't show significantly compromised brain functioning in areas "most likely damaged or impaired by a traumatic brain injury or by alcohol abuse."  Rule 37 Record (CR15-171) 1339.

Based on this Court's review of the steps taken by Lacy's trial lawyers, their choices were constitutionally adequate.  Their decision not to raise a mental disease or defect defense was informed by three expert opinions. Their investigation, and their decision not to pursue the affirmative defense, "fell within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.   Under deference review, Claim 11 is denied.

**Other Guilt Phase Claims.**  Lacy makes other arguments that his trial lawyers' work was constitutionally deficient during the guilt phase.  He says that, if his lawyers had made different decisions, there's a reasonable probability that the jury would not have found him guilty of capital murder, or sentenced him to death.  These are Claims 14, 15, 17, 19, and 20.  All are procedurally defaulted.

40

Lacy contends his trial lawyers failed to ensure a unanimous jury found him guilty of capital murder.  The prosecutor submitted two theories of capital murder—premeditated and deliberate murder, and capital felony murder.  The trial court instructed the jury that all jurors must agree on the verdict.  Because a general verdict form was used, the jury was not required to specify if the guilty verdict was based on general capital murder, capital felony murder, or both.

Lacy says his trial lawyers should have requested a special verdict form requiring the jury to designate the capital murder theory, or an instruction that the capital murder theory must be unanimous. He alternatively argues his lawyers should have made that argument in closing.  He says that, after the jury didn't find as an aggravating circumstance that he committed the capital murder for pecuniary gain, they should have moved for a new trial on the ground that the guilty verdict was not unanimous.  Lacy says that, if his trial lawyers had made this effort, there's a reasonable probability that the jury wouldn't have reached a unanimous verdict on either capital murder theory.  He argues the guilty verdict isn't reliable.  The Arkansas Supreme Court summarized the evidence supporting the jury's verdict as to capital felony murder, finding "[s]ubstantial evidence abounded." *Lacy I,* 2010 Ark. 388, *7–11, 377 S.W.3d  at 233–35.  The related factual findings are presumed correct.  28 U.S.C. § 2254(e)(1).

41

Lacy hasn't shown *Strickland* prejudice.  He has not demonstrated a reasonable probability that, absent the alleged error, the jury wouldn't have found him guilty of capital murder.  *Strickland,* 466 U.S. at 694.

Lacy also argues his trial lawyers should have called Richard Feast as a guilt phase witness.  Feast, then an investigator for the Benton County Sheriff's Department, collected the evidence from Walker's trailer.  Lacy says Feast would have testified that investigators didn't secure Walker's trailer as a crime scene until after he (Lacy) had confessed.  He says Feast's testimony would have convinced at least one juror that a death sentence wasn't warranted due to the bungled crime-scene investigation.  Lacy contends his trial lawyers also should have argued Dr. Grundy was an appropriate guilt phase witness based on his anticipated testimony of Lacy's unreliable memory.  Dr. Grundy believed Lacy had "amnesia surrounding [Walker's murder] due to alcohol."  Rule 37 Record (CR15-171) 1260-61.  He determined that, while Lacy had "some specific memories about the event," some could have been "given" to him by Laswell afterwards.  *Ibid.*  Lacy argues his trial lawyers failed to object when a juror saw him in shackles outside the courtroom; or when, from the jury room, the jury heard the clanging of his shackles and the court security officer's call to "clear the hall."   And Lacy contends his trial lawyers failed to object when the prosecutor mischaracterized the evidence in closing argument.

The jury's purported exposure to Lacy's shackles isn't part of the state court record.  Expanding the record with the new evidence is barred by § 2254(e)(2).  *Shinn*, 142 S. Ct. 1718.  None of the alleged errors rise to the level of constitutional ineffectiveness.  Other witnesses provided the same story that Feast would have told;  his testimony wouldn't have made a difference at sentencing.  There's not a reasonable probability that, with Dr. Grundy's memory-related testimony or more closing argument objections, the jury would have reached a different verdict.  *Strickland,* 466 U.S. at 694.  Evidence of Lacy's guilt was overwhelming.  Under a *Martinez-Trevino* analysis, Lacy's ineffectiveness claims aren't substantial.  Procedural default is not excused.  Claims 14, 15, 17, 19, and 20 are denied.

**Mitigation Evidence.**  Lacy argues his trial lawyers' investigation and presentation of mitigation evidence was constitutionally inadequate.  He says that, if the jury had heard evidence of his family history, childhood and marital circumstances, susceptibility to alcohol and substance abuse, depression and anxiety, or brain damage, at least one juror would have chosen a life sentence.  He also says that, if the jury had heard evidence that he was remorseful or that he was less culpable than Laswell, or that Walker was having an affair with his estranged wife, Melissa, there's a reasonable probability that he would have received a life sentence.

This is Claim 1.  Lacy divides the claim into seven parts.  Most are procedurally defaulted.

In Claim 1-1, Lacy argues his trial lawyers failed to present available mitigation evidence of his family history and unfortunate childhood circumstances.  He also contends his trial lawyers should have presented evidence of his estranged wife's infidelity, and her boyfriend's attacks on him.  Lacy alternatively argues his trial lawyers should have done more investigation.

Lacy similarly alleged in his Rule 37 petition that his trial lawyers' work was constitutionally deficient for not calling as witnesses the experts and family members who could have told his life story.  Five family members testified at the Rule 37 hearing.  The circuit court rejected Lacy's argument, finding his trial lawyers "made a full investigation into [his] life and successfully used the information available to them."  Rule 37 Record (CR17-404) 33.  Lacy's appellate argument focused only on his trial lawyers' decision not to call Dr. Grundy as a penalty phase witness.  He said Dr. Grundy would have testified about his depression diagnosis, "early exposure to substance abuse," and alcoholism.  *Doc. 7-5 at 33.*

The Arkansas Supreme Court denied relief, holding Lacy's trial lawyers' decision not to call Dr. Grundy to testify was trial strategy. *Lacy IV*, 2018 Ark. 174, *7–9, 545 S.W.3d at 751–52.  The Supreme Court also held Lacy's trial lawyers didn't commit constitutional error

in relying on his family's testimony.  The Supreme Court held the family members "spoke to Lacy's history of substance abuse as well as his troubled upbringing."  *Ibid*.  The Court held the family witnesses were adequately prepared;  and the trial lawyers were more effective than Rule 37 counsel in eliciting testimony from them about Lacy's childhood.  *Ibid*.

The *habeas* claim is procedurally defaulted.  The new evidence and argument "fundamentally alter" the argument considered by the Arkansas Supreme Court.  *Vasquez v. Hillery*, 474 U.S. 254, 260 (1986).  Review therefore is limited to the state court record, 28 U.S.C. § 2254(e)(2);  *Shinn*, 142 S. Ct. 1718.

Whether Lacy raised the *habeas* argument in circuit court and then abandoned it on appeal is a closer question.  The outcome, however, is the same, regardless of when the procedural default occurred.  Under either the *Martinez-Trevino* equitable exception for attorney errors in the initial review proceeding, *Franklin v. Hawley*, 879 F.3d 307, 313 (8th Cir. 2018), or a general cause and prejudice analysis, procedural default isn't excused.

Five family members—Kitty Barnhill (mother), Gary Lacy (maternal uncle),  John Fender (maternal uncle), Doug Barnhill (step-father), and Jennifer Hubbard (cousin)—testified in the penalty phase.  Their testimony largely focused on the family's alcohol and substance abuse during Lacy's childhood.  Kitty testified that she was an

unmarried teen mother, and that her parents had custody of Lacy when he was a baby. She said her first husband, James Rollo, was an alcoholic and verbally abusive. She testified they both used drugs. She married her second husband, Barnhill, when Lacy was five years old. She could not remember how many places they lived while Lacy was in elementary school. She said that her parents were helpful, and that Lacy sometimes stayed with them. Kitty admitted she and Barnhill drank alcohol and used drugs at various times during Lacy's childhood. She denied knowing Lacy drank alcohol in elementary school. She said that she was a "good mother," Trial Record 3034, and never missed a parent-teacher conference. She agreed that Barnhill was Lacy's "father figure." Trial Record 3041. She said that Barnhill was "stern" with Lacy, and that he "spanked" and "grounded" him. Trial Record 3043, 3045.

Barnhill testified Lacy got drunk when he was around thirteen years old. He said that he learned about the incident after it happened, and that it was a one-time thing, as far as he knew. Gary Lacy said that, once when Rollo brought Lacy to his grandparents' home, Lacy had blue powder on his face and "acted like he was really high as a kite." Trial Record 3051. Hubbard testified her father physically abused Lacy when the families lived together. She said the adults in the family smoked marijuana with the children present. Fender recalled Lacy once stealing marijuana from his parents. He

46

testified that, beginning when Lacy was sixteen or seventeen years old, the two regularly drank alcohol together.  Fender said that they also smoked marijuana, and that both had a methamphetamine addiction at one time.

At least one juror found eleven mitigation circumstances related to Lacy's childhood and substance abuse:  (1) Lacy was born to an unmarried teen mother and placed in the custody of the Department of Human Services while a baby due to his mother leaving him with strangers;  (2) Lacy was a witness to physical abuse;  (3) Lacy was a victim of psychological abuse;  (4) Lacy was a victim of physical abuse;  (5) Lacy was a witness to verbal abuse;  (6) Lacy's mother and step-father had substance abuse problems;  (7) Lacy was supplied alcohol by an uncle, John Fender, while still in junior high school; (8) during his teen years, it was not uncommon for Lacy to drink alcohol with his uncle all weekend;  (9) in his early twenties, Lacy began using methamphetamine;  (10) Lacy had attempted suicide at least once;  and (11) Lacy was cared for primarily by his uncle, Gary Lacy, and his grandparents.

At the Rule 37 hearing, Lacy attempted to elicit from five witnesses more details of his difficult childhood.  Only Kitty had testified at trial.  Her Rule 37 testimony was that, between the ages of fourteen and sixteen, Lacy began drinking alcohol in her presence. She said that, at some point, Lacy began abusing alcohol and would

drink until he passed out. Rule 37 Record (CR15-171) 833, 850–51. The other family witnesses were Lacy's ex-wife, Jamie Booher, and her mother, Barbara White; Lacy's maternal aunt, Kathy Delafuente; and Lacy's daughter, Brittany Lacy. They testified that Kitty neglected Lacy, and that he often stayed with other family members or Booher's family. Booher said Lacy began drinking alcohol and huffing in high school. White testified she met Lacy when he was thirteen or fourteen years old and living with his parents at a motel.

Harper testified about numerous meetings with family members before trial. He decided not to call Booher as a trial witness because she previously reported false information under oath. Lacy didn't want his daughter to testify. Harper said the family was a "little vague" about Lacy's childhood. Rule 37 Record (CR15-171) 1027–28. Lacy's cousin, Hubbard, told Harper that the family wasn't being truthful. Saxton testified the penalty phase witnesses were either not prepped well or went "rogue." Rule 37 Record (CR15-171) 1186. He said Kitty "got [him] the most" because "she didn't come through with what we thought she was going to come through with." *Ibid.* He remembered Harper had concerns about the information provided by the family. He said the trial lawyers expected Kitty to confirm Lacy began drinking alcohol when he was eleven.

The trial lawyers' efforts to present mitigation evidence related to Lacy's life history were constitutionally adequate. Harper worked

hard to extract from Lacy's family the mitigation story that was available. His investigation and penalty phase choices "fell within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. Lacy's ineffectiveness claim doesn't have "some merit." *Martinez*, 566 U.S. at 14. Procedural default isn't excused under the *Martinez-Trevino* equitable exception. And Lacy fares no better under a traditional cause and prejudice analysis. Claim 1-1 is denied.

In Claim 1-2, Lacy says he is predisposed to alcohol and substance abuse due to the wide availability of methamphetamine, a genetic predisposition to alcohol and substance abuse, depression and anxiety disorders, *in utero* exposure to alcohol, childhood exposure to alcohol and substance abuse, and family encouragement to drink alcohol at a young age. He says that, if his trial lawyers had argued that his alcoholism was "almost inevitable," there's a reasonable probability that the jury would have voted for a life sentence. *Doc. 16 at 44*. In Claim 1-3, Lacy says that his trial lawyers were remiss in not introducing medical records and expert testimony on his history of anxiety and depression, and two suicide attempts. Both claims are procedurally defaulted.

On this record, Lacy hasn't shown that either ineffectiveness claim has "some merit." *Martinez*, 566 U.S. at 14. Reasonable jurists would not debate the trial lawyers' constitutional effectiveness. *Dorsey*, 30 F.4th at 756–57. There's not a reasonable probability that

49

this evidence and argument would have made a difference. Even if the jury had heard more about the causes of Lacy's life-long addiction, or medical evidence of his depression and attempted suicides, there's not a reasonable probability that it would have opted for a life sentence. Under a *Martinez-Trevino* analysis, procedural default is not excused. Claims 1-2 and 1-3 are denied.

In Claim 1-4, Lacy argues his trial lawyers' work was constitutionally deficient when they didn't investigate whether he sustained organic brain damage due to *in utero* exposure to alcohol. He says his lawyers failed to uncover the key piece of evidence— maternal drinking, even though they were aware of Kitty's history of alcohol and substance abuse. He says his lawyers should have investigated whether he met the diagnostic criteria for Fetal Alcohol Spectrum Disorder (FASD). This claim is procedurally defaulted. A *Martinez-Trevino* analysis applies.

Harper wrote Dr. Grundy that he suspected maternal substance abuse, but he said that Kitty was in "complete denial." Rule 37 Record (CR15–171) 86. At the Rule 37 hearing, Dr. Crown testified fetal-alcohol exposure was a possible cause of Lacy's cognitive disorder. An FASD diagnosis, however, isn't part of the state court record. And Lacy hasn't demonstrated that, with more effort from his trial lawyers, Kitty or other witnesses would have admitted that she drank alcohol during her pregnancy. On this record, Lacy hasn't

shown a substantial ineffectiveness claim.   There are too many missing pieces.  Under a *Martinez-Trevino* analysis, procedural default isn't excused.  Claim 1-4 is denied.

In Claim 1-5, Lacy contends his trial lawyers should have pursued neuropsychological testing and brain imaging.   He says testing would have uncovered multiple deficits; he says the imaging would have shown significant brain damage.   Lacy argues these results would have reduced his moral culpability and explained why he acted the way he did.  At pages 33 through 40, this Court denied Lacy's related guilt phase claim—that his lawyers were constitutionally negligent for not pursuing an affirmative defense of mental disease or defect, or alternatively arguing that he lacked the capacity to commit capital murder.  The background material in those pages is relevant here.  This penalty phase claim is exhausted.  It is reviewed with deference to the state court decision.   28 U.S.C. § 2254(d).

Lacy argued in state court that his trial lawyers failed to investigate  neuropsychological deficits and introduce test results as mitigating evidence.   The Arkansas Supreme Court determined neither Dr. Ross's nor Dr. Grundy's report indicated Lacy had a mental disease or neuropsychological defects.  The Supreme Court also concluded Dr. Forrest told Lacy's lawyers that he "did not believe neuropsychological testing would be beneficial."  *Lacy IV*, 2018 Ark.

174, *7, 545 S.W.3d at 751. The Court held that, based on expert opinions obtained by Lacy's trial lawyers and other record evidence, the lawyers' investigation was constitutionally adequate:

> Far from ignoring the issue of neuropsychological testing, counsel explored it and was told by an independent expert that it was not needed. This conclusion was repeated during the Rule 37 proceeding by Dr. Price, who testified that he saw no indication of brain damage and was highly critical of the conclusions reached by Dr. Crown.

*Ibid.* The Supreme Court didn't address the *Strickland* prejudice element.

The Arkansas Supreme Court's decision was not contrary to, or an unreasonable application of, clearly established federal law; nor was it an unreasonable determination of the facts. 28 U.S.C. § 2254(d). Lacy argues the Supreme Court unreasonably applied *Wiggins v. Smith* and failed to consider "whether the known evidence would lead a reasonable attorney to investigate further." 539 U.S. 510, 527 (2003). He says the Supreme Court didn't recognize that the trial lawyers' duty to investigate was governed by prevailing professional norms emphasizing the importance of neuropsychological testing. Lacy also challenges Dr. Forrest's assessment, and the trial lawyers' interpretation of his recommendation.

Lacy's arguments aren't convincing. The Arkansas Supreme Court considered whether the trial lawyers' decision not to pursue

52

neuropsychological testing was "the result of reasonable professional judgment." *Lacy IV,* 2018 Ark. 174, *3, 545 S.W.3d at 749. And the Court considered the "information available to Lacy's trial lawyers." 2018 Ark. 174, *6–7, 545 S.W.3d at 750–51.

Harper testified at the Rule 37 hearing about his initial concerns of a possible brain injury, the challenges the trial lawyers faced in uncovering more evidence, and the expert opinions (particularly Dr. Forrest's) that didn't support neuropsychological testing. Dr. Forrest's assessment, moreover, was adequate to give an informed opinion. He reviewed Lacy's medical records and evaluation reports, Harper's notes about Lacy's family, and police interviews of Lacy and his family. Dr. Forrest also talked with Dr. Grundy about Lacy's test results. Dr. Forrest then informed Harper by telephone that he "doubt[ed] very seriously that neuropsych testing would indicate anything significant." Rule 37 Record (CR15-171) 11421. Lacy's lawyers also faced the risk recognized in *Forrest v. Steele,* 764 F.3d 848 (8th Cir. 2014). Because the prosecutor "might have acquired any unfavorable results, . . . the consequences of negative results were potentially severe." 764 F.3d at 856.

Under deference review, the trial lawyers' investigation of neuropsychological deficits was more than adequate. Their decision not to pursue neuropsychological testing was professionally reasonable. Lacy's lawyers didn't ignore evidence of possible brain

damage but, instead, pressed forward with their investigation until this path ended.  Claim 1-5 fails.

In Claims 1-6 and 1-8, Lacy argues his trial lawyers should have presented more evidence that he was remorseful and given the jury an explanation for the murder—Walker's purported relationship with Lacy's ex-wife.  Both claims are procedurally defaulted.  Under a *Martinez-Trevino* analysis, the default isn't excused.  On this record, neither ineffectiveness claim is substantial.  Claims 1-6 and 1-8 are denied.

In Claim 1-7, Lacy contends his lawyers' decision not to call Rebecca Chaddock and Jeff Tillotson as penalty phase witnesses was professionally unreasonable.  He says their testimony would have supported the defense theory that Laswell was more culpable in Walker's murder.  This claim is procedurally defaulted.

During the guilt phase, the prosecution moved to exclude Chaddock from testifying.  After Lacy proffered the testimony, the trial court found it was inadmissible hearsay and granted the prosecution's motion.  During the penalty phase, Harper assumed Chaddock's testimony would again be excluded and proffered her testimony a second time.  Lacy contends his trial lawyers should have called Chaddock as a penalty phase witness based on less stringent admissibility requirements for mitigation evidence.

Chaddock and Lacy had been friends since high school; they began exchanging letters after Lacy's arrest. Chaddock had never talked to Laswell. Her proffered guilt phase testimony was that Laswell began sending her kites (prohibited jail correspondence) "out of the blue" when the two were in the Benton County Jail. Trial Record 2793. She testified one or two of Laswell's kites described the Walker murder. According to Chaddock, Laswell wrote her that, during an argument between Walker and Lacy, Walker "pulled a gun." Trial Record 2796–97. She said Laswell claimed to have "reacted" and "beat [Walker] down." *Ibid.*

The Arkansas Supreme Court's related factual findings—in reviewing the admissibility of Chaddock's guilt phase testimony—are presumed correct. 28 U.S.C. § 2254(e)(1). Chaddock's proffered testimony didn't address Lacy's participation in the murder. Her story didn't contradict Lacy's confession that, after Laswell struck Walker with the weight bar, he stabbed him with the fire poker and cut his throat. *Lacy I,* 2010 Ark. 388, *15–16, 377 S.W.3d 277, 236–37. And Lacy stated in his police interview and to his cousin, Fender, that Laswell hit Walker with the weight bar. *Ibid.*

Lacy also argues he could have avoided the death sentence if the jury had heard Tillotson's anticipated penalty phase testimony: Laswell admitted killing Walker without implicating Lacy; and Walker was the aggressor, pulling a gun on them that night. Early in

the investigation, Tillotson called the Benton County Sheriff's Department and talked to Investigator Hines. Tillotson said Laswell had admitted to him that he was involved in the Walker murder.

According to Investigator Hines, Tillotson was intoxicated and recalled Laswell's name only after looking back at his newspaper. He asked Hines to "take care of his warrants." Trial Record 2318. Tillotson later talked to the defense investigator and the prosecutor. He told different stories about a gun. Lacy's lawyers intended to proffer Tillotson's testimony on the last day of the guilt phase, but Tillotson was too drunk to appear in court. The Arkansas Supreme Court, reviewing a potential *Brady* violation, made findings related to Tillotson's anticipated testimony. *Lacy I,* 2010 Ark. 388, *26–27, 377 S.W.3d 227, 242–43. The Supreme Court held Lacy wasn't prejudiced by the prosecutor's failure to timely turn over the recording of Tillotson's telephone call to Investigator Hines. During the guilt phase, Fender testified that Lacy told him about Walker pulling a gun. *Ibid.*

This ineffectiveness claim isn't substantial. Reasonable jurists would not debate whether the *Strickland* standard was satisfied. *Dorsey*, 30 F.4th at 756–57. Lacy hasn't cleared the *Strickland* prejudice hurdle. There's not a reasonable probability that either Chaddock's or Tillotson's testimony would have resulted in a life sentence. Under a

*Martinez-Trevino* analysis, procedural default is not excused. Claim 1-7 is denied.

**Other Penalty Phase Claims.** Lacy argues his trial lawyers made other missteps in the penalty phase, mostly related to the avoid-arrest aggravator. Claim 22 is procedurally defaulted.

The trial court submitted to the jury three aggravating circumstances: the murder was committed in an especially cruel and depraved manner; the capital murder was committed for pecuniary gain; and the capital murder was committed for the purpose of avoiding or preventing an arrest. The jury found that the first and third circumstances existed. Lacy contends his trial lawyers should have made better arguments that there was insufficient evidence of the avoid-arrest aggravator. He says Fender's guilt phase testimony was the only evidence supporting the aggravator. Lacy also argues his trial lawyers should have raised a due process violation challenging the service of the prosecutor's subpoena on Fender as "an exercise in raw authority." *Doc. 16 at 119.* And Lacy says his trial lawyers should have done a better job cross-examining Fender.

Under Arkansas law, the prosecutor was authorized to serve a subpoena on Fender for a witness interview. Ark. Code Ann. § 16-43-12(a). Fender was interviewed twice pursuant to the state statute. During the guilt phase, the prosecutor questioned Fender about his statement given under the challenged subpoena: Lacy told

57

Fender that he stabbed Walker because he and Laswell "knew they were going to be in trouble either way."  Trial Record 2115.  The prosecutor worked hard to get Fender to admit that he heard Lacy make those statements.  Lacy's lawyer, Barnica, did not object during this part of direct examination or include this point in her cross-examination.   She didn't give Fender the opportunity to distinguish between what Lacy told him and what he interpreted Lacy to mean.

Barnica argued at the end of the guilt phase that there was insufficient evidence of the avoid-arrest aggravator.  The trial court deferred a ruling.  At the beginning of the penalty phase, Harper summarily stated that there was insufficient evidence to submit the avoid-arrest aggravator to the jury.  Denying the motion, the trial court found "a great deal of evidence" supported the aggravating circumstances.  Trial Record 2968.

Based on the circumstances of the capital murder and Lacy's acquaintance with Walker, there's not a reasonable probability that more argument, a due process challenge, or a better guilt phase cross-examination of Fender would have changed the trial court's decision on submitting the avoid-arrest aggravator or the jury's finding that the aggravator existed.  Lacy also says he could not have stabbed Walker for the purpose of avoiding arrest because Walker was already dying from Laswell's fatal blows.  But Lacy wasn't certain

Laswell's blows were fatal.  He admitted stabbing Walker and cutting his throat "to make sure he was dead."  Trial Record 3616 (Audio Recording), 3623, 3625.

Lacy's remaining ineffectiveness arguments challenging his lawyers' work also fall short.   Different decisions about the police-interview recording heard by the jury during the guilt phase wouldn't have made a difference at sentencing.  Other choices about witnesses, more objections, a better closing, or an *Allen* charge request would not have mattered either.   None of these penalty phase ineffectiveness claims have "some merit."  *Martinez*, 566 U.S. at 14. Because Lacy's ineffectiveness claims aren't substantial, procedural default is not excused.  *Ibid*.  Claim 22 fails.

8.   **Trial Error Claims.**   Lacy contends several trial errors resulted in a violation of his constitutional rights.  These are Claims 3, 4, 9, 12, 13, 16, 18, 21, 25, 26, and 27.  Most are intertwined with related ineffectiveness of trial counsel claims.  Lacy admits in his traverse that Claim 13, a jury instruction challenge, is based on state law and therefore outside *habeas* review. *Doc. 16 at 101.*

Lacy says that, due to the prosecutor's contribution to the trial judge's election campaign, there was an impermissible appearance of judicial bias.   He says his trial was fundamentally unfair because his clanging shackles were heard in the jury room, and a juror saw him shackled outside the courtroom.  He contends Juror Gildehaus wasn't

impartial, based on a sworn statement of her death penalty views. He says his right to an impartial jury was also violated when the trial court dismissed four jurors for cause; he argues their death penalty qualms would not have impaired their performance. He contends the trial court prevented adequate *voir dire* on mitigation evidence. He says there was a Confrontation Clause violation when Dr. Peretti testified about Walker's post-mortem lab results of his carboxyhemoglobin level. And he says there was insufficient evidence of the avoid-arrest aggravator.

These claims are procedurally defaulted. The new evidence is barred from this Court's review. 28 U.S.C. § 2254(e)(2). And the Court rejects Lacy's argument that the *Martinez-Trevino* equitable exception extends to his judicial bias claim. Procedural default is not excused. Claims 4, 9, 13, 18, 21, 25, 26, and 27 are denied.

**Inconsistent Testimony.** Lacy says there was a due process violation because Dr. Peretti knew his testimony — about the timing of Walker's death — wasn't supported by scientific research. But there's no support for Lacy's argument in the record. He also contends there was constitutional error because Dr. Peretti gave a different opinion at Laswell's trial. This is Claim 3.

Four months after Lacy's trial, Dr. Peretti testified at Laswell's trial. His testimony on direct was that Walker's fifteen percent carboxyhemoglobin level "could be a combination of his heavy

smoking and just taking a breath . . . as he's dying." *Doc. 7-7 at 24–25.* On cross-examination, Dr. Peretti said Walker's elevated carboxyhemoglobin level could be due to a "combination" of smoking and "agonal breathing a tad." He added, "[T]here is no way for me to truthfully tell you." *Doc. 7-7 at 70.* Lacy argues that Dr. Peretti's testimony at his trial, outlined at pages 28 and 29, offered more certainty that Walker was alive when the fire was burning.

Lacy didn't present this claim in state court. He contends the claim isn't procedurally defaulted because it accrued after he filed his Rule 37 petition, and the circuit court wouldn't allow amendments to the petition. This Court's review of the Rule 37 record, outlined at pages 13 through 15, doesn't support Lacy's argument. Lacy didn't timely allege facts supporting an amended Rule 37 petition.

Lacy alternatively argues the *habeas* exhaustion requirement is excused because the other state court remedy—the *coram nobis* procedure—isn't part of the ordinary review process. Arkansas courts, however, recognize a writ of error *coram nobis* as the remedy for "certain fundamental errors extrinsic to the record." *Isom v. State*, 2015 Ark. 225, *2, 462 S.W.3d 662, 663. The Arkansas Supreme Court considers reinvesting jurisdiction in the circuit court to consider a *coram nobis* petition if the petitioner exercised due diligence in seeking relief. *Wallace v. State*, 2018 Ark. 164, *5–6, 545 S.W.3d 767, 771.

Lacy acknowledges that Laswell's trial record was filed more than ten years ago. But he first challenged Dr. Peretti's testimony in his *habeas* petition. And he has yet to seek *coram nobis* relief in state court. Because of this delay, the Arkansas Supreme Court would decline to reinvest jurisdiction in the circuit court to consider Lacy's *coram nobis* petition. *Dansby v. Payne,* 47 F.4th 647, 658 (8th Cir. 2022). With no state remedies available, the claim is procedurally defaulted. Lacy hasn't demonstrated any excuse for the default. Under an alternative merits analysis, Lacy hasn't shown any error "fatally infected the fairness of his trial, thereby depriving [him] of due process." *Harris v. Bowersox,* 184 F.3d 744, 755–56 (8th Cir. 1999). Nor has he shown any error had "substantial and injurious effect or influence" on the verdict or sentence. *Brecht*, 507 U.S. at 623.

At Lacy's trial, Harper cross-examined Dr. Peretti about the journal article contradicting his assumption related to smoking and elevated carboxyhemoglobin levels. Dr. Peretti referred to the "literature" at Laswell's trial, *Doc. 7-7 at 24*; and he was less certain of the timing of Walker's death. But the prosecutor's theory—Walker's carboxyhemoglobin level indicated he was alive when Lacy set the fire—was the same at both trials. There wasn't an "inconsistency . . . at the core of the prosecutor's case" against Lacy. *Smith v. Groose,* 205 F.3d 1045, 1052 (2000). Lacy's conviction wasn't "rendered unreliable." *Ibid.* Claim 3 is denied.

**Testimony Exclusion.**  In Claim 16, Lacy argues the trial court violated his due process right by excluding the guilt phase testimony of Chaddock and Dr. Grundy, and Dr. Holden's psychiatric evaluation report from Vista Health.  He says that Chaddock's testimony—Laswell admitted that he "was the one that beat Walker down"—would have supported his defense theory that he was a minor player in Walker's murder.  Trial Record 2789.  He contends Dr. Grundy's memory-related testimony, described at page 42, and Dr. Holden's alcohol amnestic disorder diagnosis would have rebutted the prosecutor's argument that, during the police interviews, he wasn't forthcoming about the crime.  Lacy says this evidence also would have supported an argument that his interview responses came from information that Laswell told him, not his independent memories.

Lacy similarly challenged the trial court's exclusion of this evidence in the Arkansas Supreme Court.  He argued the trial court misapplied state evidentiary rules and unconstitutionally hampered his defense.  *Lacy I*, 2010 Ark. 388, *11–23, 377 S.W.3d at 235–40; *Doc. 7-2 at 2–13, 70–80*.  The Arkansas Supreme Court held Chaddock's testimony was impermissible hearsay, and Dr. Holden's report was cumulative evidence of Lacy's alcohol abuse.  2010 Ark. 388, *15–16, 19–21, 377 S.W.3d at 236–37, 239–40.  The Court determined Lacy's

argument about Dr. Grundy's testimony wasn't preserved for appellate review.  2010 Ark. 388, *12–14, 377 S.W.3d at 235–36.

Lacy contends his *habeas* claim isn't exhausted because the state court's decision rested only on state law grounds.   But he hasn't rebutted the presumption that the Arkansas Supreme Court adjudicated his due process claim—as to Chaddock's testimony and Dr. Holden's report—on the merits.  *Johnson v. Williams*, 568 U.S. 289, 300–01 (2013).  The constitutional claim wasn't "rejected as a result of sheer inadvertence."  568 U.S. at 302–03.  The Supreme Court recognized Lacy's constitutional challenges.  But there was no basis for finding a due process violation after the Court affirmed the trial court's evidentiary rulings.   The Court, moreover, independently reviewed the entire record, as required by state rules, and found no reversible error.  *Lacy I*, 2010 Ark. 388, *31–32, 377 S.W.3d at 244–45.  The mandatory review "fortifies the presumption" that the state court decided Lacy's due process claim on the merits.  *Dansby v. Hobbs,* 766 F.3d 809, 832 (8th Cir. 2014).

The Arkansas Supreme Court's decision was not contrary to, or an unreasonable application of, clearly established federal law.   28 U.S.C. § 2254(d).   The constitutional right to present a defense is violated when evidence rules "infringe upon a weighty interest of the accused and are arbitrary or disproportionate to the purposes they are designed to serve."  *Holmes v. South Carolina,* 547 U.S. 319, 324–25

(2006) (quotations omitted).  Evidence rules are arbitrary, as written or applied, if they "excluded important defense evidence" but "did not serve any legitimate interests." *Ibid.* Lacy argues the Arkansas Supreme Court arbitrarily applied state court rules on hearsay and cumulative evidence.  He challenges the Supreme Court's holding that Chaddock's hearsay testimony wasn't admissible under the statement-against-interest exception to the hearsay rule, Ark. R. Evid. 804(b)(3).  He says the Supreme Court overlooked his argument supporting admission of Dr. Holden's report:  Dr. Holden's alcohol-amnesia diagnosis would have supported the defense theory that Lacy wasn't withholding information during his interview.  But Lacy's constitutional right to present a defense wasn't impaired.  Hearsay and cumulative evidence rules are "well-established" and "widely accepted." *Holmes,* 547 U.S. at 326–27.  Neither Chaddock's testimony nor Dr. Holden's report would have been significant defense evidence.  There was other evidence that Laswell struck the initial fatal blow;  Chaddock's testimony wouldn't have exculpated Lacy. *Lacy I,* 2010 Ark. 388, *15–16, 377 S.W.3d at 236–37.  Dr. Holden diagnosed Lacy with alcohol amnesia two years before Walker's murder.  Without his testimony explaining the basis for his diagnosis and its implications, the written report had limited evidentiary value.  Whether Lacy was forthcoming during his police interview,

moreover, had no bearing on the crux of the prosecution's case. Under deference review, this part of Claim 16 is denied.

The Arkansas Supreme Court held that, because Lacy didn't argue at trial that Dr. Grundy's memory-related testimony was admissible, the issue wasn't preserved for appeal. *Lacy I*, 2010 Ark. 388, *12–14, 377 S.W.3d at 235–36. State court decisions aren't reviewable when they are based on independent and adequate state grounds. *Coleman*, 501 U.S. at 729–30. Lacy, however, contends that Payne fails to raise a procedural default defense and therefore waives it.

Merits review is the more efficient approach. There wasn't a due process violation based on memory-related testimony. The trial court found Dr. Grundy's testimony was impermissible voluntary intoxication evidence. Lacy didn't revisit the issue. Because there was no constitutional error, the remainder of Claim 16 is denied.

**Sufficiency Of The Evidence.** Lacy also contends there was insufficient evidence to find him guilty of capital murder under either submitted theory—premeditated and deliberated murder or capital felony murder. This is Claim 12.

Though a general verdict form was used, Lacy assumed in his direct appeal that his capital murder conviction was based only on the felony murder theory because the jury also found him guilty of aggravated robbery. *Doc. 7-2 at 31.* He argued that the prosecutor

didn't prove beyond a reasonable doubt that he was guilty of capital felony murder. *Ibid.*

Denying relief, the Arkansas Supreme Court held substantial evidence supported the guilty verdict based on the capital felony murder theory. *Lacy I*, 2010 Ark. 388, *10 fn.3, 377 S.W.3d at 234 fn.3. The Supreme Court didn't consider whether sufficient evidence supported premeditated and deliberated capital murder. *Ibid.* The Court relied on Arkansas law that a general guilty verdict will be affirmed if there is sufficient evidence to prove any submitted theory. *Ibid.* The Supreme Court's denial of Lacy's sufficiency point under the substantial evidence standard was an adjudication of his *habeas* due process claim. *Dansby*, 766 F.3d at 817–18. Deference review under 28 U.S.C. § 2254(d)(1) therefore is appropriate.

The Arkansas Supreme Court's decision was not contrary to, or an unreasonable application of, federal law. 28 U.S.C. § 2254(d)(1). The Due Process Clause forbids a conviction when "no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 324 (1979). The *Jackson* standard doesn't permit reweighing the evidence; inconsistencies must be resolved in favor of the prosecution. 433 U.S. at 319. Under Arkansas law, a person commits capital felony murder if, acting alone or with another person, he commits or attempts to commit robbery, and in the course of and in furtherance of the robbery or in immediate flight

therefrom, he or an accomplice causes the death of any person under circumstances manifesting extreme indifference to the value of human life. Ark. Code Ann. § 5-10-101(a). Applying the capital felony murder definition, the Arkansas Supreme Court held substantial evidence—based on Lacy's police interviews and Fender's testimony—supported the jury's verdict that Lacy committed aggravated robbery and capital felony murder:

> [Lacy's] statements all substantiate that the robbery and murder took place very close in time. The evidence presented by the State was that Lacy knew about the safe, hit Walker over the head with the poker, and then forced him to open the safe. Lacy also admitted that he expected there to be money or something of value in the safe. This was all ample circumstantial proof that Lacy intended to commit a robbery. Moreover, the statements from Lacy's cousin, Fender, that Lacy took the .22 caliber gun and some money from Walker's house support the jury's conclusion that a robbery did in fact occur. The fact that a robbery did not occur until after Walker was dead is unimportant.

> In sum, the evidence supports the conclusion that the death of Walker occurred during a robbery under circumstances manifesting extreme indifference to the value of human life. The additional fact that Lacy set fire to the trailer confirms that conclusion. Substantial evidence abounded . . ..

*Lacy I,* 2010 Ark. 388, *10–11, 377 S.W.3d at 234–35.

Lacy argues there was insufficient evidence that he intended to commit robbery. He also contends the murder couldn't have been in

the course of and in furtherance of a felony because he inflicted the fatal blows after completing the failed robbery and left six dollars in Walker's shorts pocket.  Lacy says the jury's failure to unanimously agree on the pecuniary-gain aggravator supports his arguments.

The Arkansas Supreme Court's analysis "was not an unreasonable way for a state court to ensure that a rational trier of fact could have found the requisite elements [of capital felony murder] beyond a reasonable doubt."  *Dansby*, 766 F.3d at 818.  First, the Supreme Court wasn't unreasonable in applying state court precedent interpreting Arkansas's capital felony murder statute.  *Lacy I*, 2010 Ark. 388, *10–11, 377 S.W.3d at 235 (citing *Grigsby v. State*, 260 Ark. 499, 509, 542 S.W.3d 275 (1976)).  In *Grigsby*, the state court held that, when considering the sufficiency of evidence supporting felony murder, "[t]he sequence of events is unimportant and the killing may precede, coincide with or follow the robbery and still be committed in its perpetration."  260 Ark. at 507–510, 542 S.W.2d at 280–82.  Second, the Court's conclusion that there was substantial evidence supporting the elements of capital felony murder wasn't unreasonable.  The jury heard Lacy's recorded statement that he forced Walker to open his bedroom safe because he mistakenly believed it held something of value.  And the jury heard evidence that Lacy took Walker's wallet and .22 caliber pistol.  The evidence more than satisfies the due process standard.

69

The parties spar over whether the remainder of Lacy's claim—insufficient evidence to find that he committed premeditated and deliberated murder—is procedurally defaulted. While Lacy made this sufficiency argument in his directed verdict motion at trial, he argued on appeal only that there was insufficient evidence to support the capital felony murder theory. *Doc. 7-2 at 28–31.* Lacy says that he raised the point based on the heading in his appellate brief—"The Trial Court Erred By Failing To Grant Lacy's Motions For Directed Verdict." *Ibid.* Lacy's heading, however, didn't give the Arkansas Supreme Court an opportunity to review the sufficiency argument based on the capital felony murder theory. This part of Claim 12 is procedurally defaulted, and Lacy hasn't shown any excuse for the default. The argument also fails under an alternative merits theory. Arkansas courts have recognized that "[p]remeditation and deliberation may be formed in an instant." *Marcyniuk v. State*, 2010 Ark. 257, *9, 373 S.W.3d 243, 250. Based on the murder circumstances, a rational trier of fact could have found beyond a reasonable doubt that Lacy acted with premeditation and deliberation. Claim 12 is denied.

9.   **Prosecutorial Misconduct Claims.**   Lacy next contends there were several incidents of prosecutorial misconduct during the trial. This is Claim 23.

70

Lacy contends the prosecutor's subpoena of Fender for a second interview was a due process violation.  He says there wasn't a similar procedure available to him, and the prosecutor didn't timely provide this evidence to his lawyers.  Lacy also argues the prosecutor's *voir dire* comments created an expectation of a mental health defense thereby impermissibly shifting the burden of proof.  He says the prosecutor's statements during guilt and penalty phase closings deprived him of a fair trial.  These sub-claims, Claim 23-1, 23-2, 23-4, and 23-5, are procedurally defaulted.  Lacy hasn't demonstrated any excuse for his default.  This part of Claim 23 is denied.

**Evidence Suppression.**  In Claim 23-3, Lacy says the prosecutor made false statements, or suppressed evidence, when challenging the admissibility of Chaddock's testimony about Laswell's kite.  The prosecutor argued Chaddock's proffered testimony wasn't credible partially due to the jail segregation of male and female inmates.  Lacy says the prosecutor knew or should have known that jail segregation wouldn't have prevented Laswell from passing a kite to Chaddock; he points to Laswell's undisclosed disciplinary report for passing a kite to another female inmate.

Lacy didn't raise this sub-claim in state court.  He urges *de novo* review, again arguing the exhaustion requirement is excused because there's no available state court remedy in the ordinary review process.  Lacy's argument fails, as outlined at page 61.  The *coram nobis*

procedure isn't outside the state's ordinary review of evidence-suppression claims. *Isom*, 2015 Ark. 225, *2, 462 S.W.3d at 663.

Lacy's alternative argument—the prosecutor's failure to disclose Laswell's jail records is cause to excuse procedural default—fares no better. Lacy hasn't shown that the prosecutor knew, or should have known, of Laswell's disciplinary report and "deliberately withheld it." *Evans v. Luebbers*, 371 F.3d 438, 443–44 (8th Cir. 2004). Nor has Lacy demonstrated procedural bar prejudice to excuse the default. He hasn't shown Laswell's disciplinary report was material to his conviction or sentence. *Banks v. Dretke*, 540 U.S. 668, 698–99 (2004). As this Court found at page 55, Chaddock's cumulative testimony would not have made a difference. Claim 23-3 is denied.

Lacy also urges *de novo* review of his sub-claim that the prosecutor withheld, and continues to withhold, work-product and victim-impact files. This is Claim 23-6. Lacy didn't raise the sub-claim in state court. He says Payne has responded only to the claim's merits and therefore has waived the procedural default defense. An alternative merits analysis is the more efficient approach. The claim is empty. Lacy makes no argument that the files contain evidence material to his conviction or sentence. "Mere speculation is not sufficient to sustain a *Brady* claim." *United States v. Aleman*, 548 F.3d 1158, 1164 (8th Cir. 2008) (quotations omitted). Claim 23-6 is denied.

**10.     Ineffectiveness Of Appellate Counsel.**  Lacy argues that his lawyer on direct appeal, Janice Vaughn, failed to raise several meritorious points on appeal.  The claim is procedurally defaulted, and Lacy hasn't demonstrated any excuse for the default.  Claim 28 is denied.

**11.     Ineffectiveness Of Postconviction Counsel.**     Lacy challenges his Rule 37 lawyers' work only to preserve the claim. *Doc. 16 at 145.*  "There is no constitutional right to an attorney in state post-conviction proceedings." *Coleman*, 501 U.S. at 752.  Claim 29 is denied.

**12.     Murder Statute Challenge.**  Lacy argues that his capital murder conviction was arbitrary due to overlapping definitions of first-degree murder, Ark. Code Ann. § 5-10-102, and capital murder, Ark. Code Ann. § 5-10-101.   This is Claim 31.   The claim is procedurally defaulted, and Lacy hasn't shown any excuse for the default.  The Eighth Circuit, moreover, rejected Lacy's argument in *Simpson v. Lockhart,* 942 F.2d 493, 496–97 (8th Cir. 1991).  Claim 31 is denied.

**13.     Death Penalty Challenges.**     Lacy   raises   several constitutional challenges to the Arkansas death penalty statute, Ark. Code Ann. § 5-4-603, on its face and as applied.  These are Claims 30, 32, and 33.  All are procedurally defaulted.

Lacy says cause exists to excuse the default because his legal arguments challenging the death penalty are novel.  He also says Claims 30 and 32 rely on death penalty data originating after his trial. Lacy's arguments, however, are not so novel that the "tools . . . to construct" them weren't available when Lacy's case was in state court. *Frizzell v. Hopkins*, 87 F.3d 1019, 1021 (8th Cir. 1996).  Procedural default is not excused.

Lacy's death penalty challenges, moreover, fail under an alternative merits basis.  Lacy says that the death penalty is imposed more frequently in Benton County than in other Arkansas counties. But he hasn't demonstrated a "constitutionally significant risk" that the state's geography affects the application of the death penalty. *McCleskey v. Kemp*, 481 U.S. 279, 308–13 (1987).  Lacy next argues that the death penalty is unconstitutional based on evolving standards of decency.  But there's no direct authority to support his argument, and the United States Supreme Court reaffirmed the constitutionality of the death penalty in *Glossip v. Gross*, 576 U.S. 863 (2015).  There's also no authority supporting Lacy's argument that he's ineligible for the death penalty due to mental illness.  Claims 30, 31, and 33 are denied.

**14.   Cumulative Error.**  Lacy's final argument is that his trial lawyers' cumulative errors amounted to constitutional ineffectiveness. This is Claim 34.

Lacy made a similar argument during his Rule 37 proceedings. The Arkansas Supreme Court rejected the claim, holding that it doesn't recognize cumulative error in ineffectiveness allegations. *Lacy IV*, 2018 Ark. 174, *9–10, 545 S.W.3d at 752. Lacy also asked the Supreme Court to overrule state court precedent. The Court denied his request, holding Lacy had not shown "injustice or great injury" would result if precedent wasn't overruled. The Court noted that Lacy had not shown attorney error in the penalty phase, "much less that an accumulation of error should result in his receiving a new sentencing hearing." *Ibid.*

The Arkansas Supreme Court's decision was not contrary to, or an unreasonable application of, clearly established federal law. 28 U.S.C. § 2254(d). Under circuit precedent, *habeas* relief isn't available based on "the cumulative effect of attorney errors." *Shelton v. Mapes,* 821 F.3d 941, 951 (8th Cir. 2016). Claim 34 is denied.

**15.   Actual Innocence.** Lacy argues that his actual innocence is a gateway to considering procedurally defaulted claims. He says that he isn't criminally responsible for murdering Walker, and that he is innocent of the death penalty. Lacy's arguments fall short of demonstrating actual innocence. Procedural default is not excused.

Lacy says that, due to fetal-alcohol exposure effects and his intoxicated state when he killed Walker, he didn't have the capacity to commit capital murder. He also says that he wasn't able to form the

premeditation and deliberation required for the crime. Lacy, however, doesn't rely on evidence that "was not available at trial and could not have been discovered with due diligence." *Kidd v. Norman*, 651 F.3d 947, 951–54 (8th Cir. 2011). He hasn't demonstrated that, in light of new evidence, "it is more likely than not that no reasonable juror would have convicted him." *Schlup v. Delo*, 513 U.S. 298, 327 (1995).

Lacy also argues that the jury wouldn't have imposed the death penalty if it had heard more mitigation evidence. And he says that he was unable to form the intent necessary for the aggravators. Death penalty eligibility, however, refers to the underlying guilty verdict and death-qualifying aggravators. *Wooten v. Norris*, 578 F.3d 767, 781-82 (8th Cir. 2009). And Lacy hasn't shown "by clear and convincing evidence that, but for a constitutional error, no reasonable juror would have found [him] eligible for the death penalty." *Sawyer v. Whitley*, 505 U.S. 333, 336 (1992).

\*       \*       \*

For all the reasons stated, Lacy's *habeas* petition fails and will be dismissed. Early on, the Court granted Payne's motion, *Doc. 8*, to file portions of the state court record under seal, with the caveat that the Court would revisit the sealing issue after reviewing the record. *Doc. 9*. The Court has now reviewed the record. There is no reason for these parts of the record to be sealed, and the Court directs the Clerk to unseal them. *Doc. 10*.

So Ordered.

_____

D.P. Marshall Jr.
United States District Judge

1 May 2023

## APPENDIX A

Claim 1. Trial lawyers were constitutionally ineffective in investigating and presenting penalty phase evidence.

    1-1.  Failed to develop a theme of intergenerational poverty, neglect, and trauma.

    1-2.  Failed to explain Lacy's susceptibility to drug and alcohol addiction.

    1-3.  Failed to present available evidence of Lacy's depression and anxiety disorders.

    1-4.  Failed to discover and present evidence of Fetal Alcohol Syndrome.

    1-5.  Failed to discover and present evidence of brain damage.

    1-6.  Failed to develop a remorse theme.

    1-7.  Failed to present evidence that Lacy was less culpable than Laswell.

    1-8.  Failed to present evidence of Walker's relationship with Lacy's ex-wife.

Claim 2.  Trial lawyers' handling of forensic evidence was constitutionally ineffective.

    2-1.  Failed to retain an independent pathologist to challenge Dr. Peretti's analysis of Walker's wounds.

2-2.   Failed to retain an independent pathologist to refute Dr. Peretti's opinion that Walker was alive when his body was set on fire.

2-3.   Failed to challenge testimony that Walker's carboxyhemoglobin level was fifteen percent.

2-4.   Failed to cross-examine Mary Simonson.

Claim 3.       Dr. Peretti's inconsistent testimony violated Lacy's due process right.

Claim 4.       Testimony that Walker's carboxyhemoglobin level was fifteen percent violated Lacy's Confrontation Clause right.

Claim 5.       Trial lawyers' failure to move for suppression of Lacy's confessions was constitutionally ineffective.

Claim 6.       Trial lawyers were constitutionally ineffective for failing to seek suppression based on the search of Lacy's cellphone.

Claim 7.       Trial lawyers' failure to move for a venue change was constitutionally ineffective.

Claim 8.       Trial lawyers were constitutionally ineffective for failing to explore a plea bargain for life imprisonment based on the wishes of the Walker's family.

Claim 9.       The trial judge was biased.

Claim 10.      Trial lawyers were constitutionally ineffective for failing to seek the trial judge's recusal.

Claim 11.       Trial lawyers were constitutionally ineffective for failing to develop and present a mental-defect or lack-of-capacity defense.

Claim 12.       The prosecutor presented insufficient evidence of Lacy's guilt.

Claim 13.       The trial court failed to instruct the jury that the capital murder theory must be unanimous.

Claim 14.       Trial lawyers were constitutionally ineffective for failing to ensure the unanimous capital murder theory instruction.

Claim 15.       Trial lawyers' failure to call Richard Feast as a witness was constitutionally ineffective.

Claim 16.       The trial court unconstitutionally limited guilt phase evidence.

Claim 17.       Trial lawyers' arguments for admission of Dr. Grundy's testimony were constitutionally deficient.

Claim 18.       Courtroom security measures violated Lacy's due process right.

Claim 19.       Trial lawyers' failure to challenge courtroom security measures was constitutionally ineffective.

Claim 20.       Trial lawyers failed to object to the prosecutor's unconstitutional closing remarks in the guilt phase.

Claim 21.    The prosecutor presented insufficient evidence of the avoid-arrest aggravator.

Claim 22.    Trial lawyers were constitutionally ineffective during the penalty phase.

22-1. Failed to explain the basis of the directed verdict motion.

22-2. Failed to challenge testimony on the avoid-arrest aggravator.

22-3. Unreasonably permitted alteration of Lacy's confessions.

22-4. Failed to insist on presentation of the video-taped recording of Lacy's confession.

22-5. Unreasonably presented witness testimony about Lacy's knowledge of fire science.

22-6. Failed to present evidence that Walker was not disabled to the extent claimed by the prosecutor.

22-7. Failed to inform the jury that one juror could decide to show mercy.

22-8. Failed to request an *Allen* charge.

22-9. Failed to object to prosecutorial misconduct during closing.

22-10. Failed to object to the subpoena of Zach Fender.

Claim 23.      The prosecutor engaged in misconduct.

                23-1.  Subpoenaed Zach Fender.

                23-2.  Made *voir dire* statements shifting the burden to Lacy.

                23-3.  Made false statements about Rebecca Chaddock.

                23-4.  Made unconstitutional statements during guilt phase closing.

                23-5.  Made unconstitutional statements during penalty phase closing.

                23-6.  Withheld material evidence.

Claim 24.      Trial lawyers were constitutionally ineffective during *voir dire*.

                24-1. Failed to strike Juror Afton Gildehaus.

                24-2.  Failed to rehabilitate a qualified juror.

                24-3.  Unreasonably struck favorable jurors.

                24-4.  Failed to strike jurors for cause.

                24-5. Failed to seek individual sequestered *voir dire*.

                24-6. Failed to object to prosecutorial misconduct.

Claim 25.      Gildehaus's presence on the jury was unconstitutional.

Claim 26.  The trial court's dismissal of jurors was unconstitutional.

Claim 27.  *Voir dire* restrictions were unconstitutional.

Claim 28.  Lacy's appellate lawyer was constitutionally ineffective.

28-1. Failed to appeal the sufficiency of the avoid-arrest aggravator.

28-2. Failed to appeal the omission of the jury instruction that the capital murder theory must be unanimous.

28-3. Failed to raise the prosecutor's *voir dire* misconduct.

28-4. Failed to raise the *Witherspoon* violations.

28-5. Failed to appeal the trial court's limitations on *voir dire*.

28-6. Failed to raise the prosecutor's misconduct during closing argument.

Claim 29.  Lacy's post-conviction lawyer was constitutionally ineffective.

Claim 30.  Geographic disparity in the application of the death penalty violates the Eighth Amendment.

Claim 31.  Lacy's conviction and sentence violate due process requirements because his conduct met the definition of first-degree murder.

Claim 32.  The death penalty is unconstitutional based on evolving standards of decency.

Claim 33.   Lacy is exempt from the death penalty due to mental illness, developmental disability, and brain damage.

Claim 34.   Cumulative error violates due process requirements.